T.C. GREYWOLF, Appellant,

v.

William N. CARROLL, M.D., Appellee.

No. S–11830.

Supreme Court of Alaska.

Jan. 5, 2007.

Rehearing Denied Feb. 28, 2007.

James M. Hackett, Law Office of James M. Hackett, Fairbanks, for Appellant.

Donna M. Meyers, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

A mental health unit patient, T.C. Greywolf, was arrested at Fairbanks Memorial Hospital and discharged to Fairbanks Correctional Center on a charge of felony assault in the third degree because she had allegedly threatened to harm her psychiatrist, Dr. William Carroll. After Greywolf was acquitted in her criminal trial, she filed a lawsuit against Dr. Carroll for (1) malicious prosecution; (2) abuse of process; (3) invasion of privacy; and (4) medical malpractice. The superior court granted summary judgment in favor of Dr. Carroll on three of the claims, ruling that Greywolf had failed to establish genuine issues of material facts on each element of the respective claims. The superior court dismissed the fourth claim on the ground that Dr. Carroll was protected by the doctrine of absolute quasi-judicial immunity. We affirm the superior court's summary judgment rulings.

## II. FACTS AND PROCEEDINGS

At the time of the events leading to this case, T.C. Greywolf was thirty-nine years old, had a ten-year history of multiple psychiatric hospitalizations, and had been confirmed as suffering from Post Traumatic Stress Disorder. Dr. William Carroll is a psychiatrist who usually lives and practices in Anchorage but temporarily practiced at Fairbanks Memorial Hospital whenever the hospital did not have a local psychiatrist.

Dr. Carroll's first contact with Greywolf was in May 2000, when she was admitted to Fairbanks Memorial Hospital twice within a three-week period because she had attempted suicide. Greywolf's medical records indicated that she had a long history of self-abuse previous to May 2000, including acts of cutting, poisoning, and attempting to hang herself. Greywolf was treated again by Dr. Carroll in August 2000.

On September 18, 2000, Greywolf stood outside Fairbanks Memorial Hospital and held a gun to her chest with a single round in the chamber. After approximately thirty minutes, she shot herself in the chest. She was treated at Fairbanks Memorial Hospital and then transported to Anchorage, first to Providence Hospital for treatment of the wound and then to the Alaska Psychiatric Institute (API). Dr. Carroll treated her both at Fairbanks Memorial Hospital before the shooting and at API in September. Greywolf was also seen by Dr. Mark Erickson,

who diagnosed Greywolf with Post Traumatic Stress Disorder and Depressive Disorder on Axis I and Borderline Personality on Axis III.

Greywolf later told Dr. Pogos Voskanian, a psychiatrist hired by Greywolf's lawyer to evaluate the level of care provided to Greywolf by Dr. Carroll, that she had filed a grievance against Dr. Carroll one day before she was discharged from API because Dr. Carroll had discussed Greywolf's case in front of the staff and other patients and because he was "demeaning."

Greywolf was released from API on an unknown date and returned to Fairbanks. On November 8, 2000, Dr. Carroll admitted her to Fairbanks Memorial Hospital for an involuntary seventy-two-hour evaluation because she was threatening suicide. Dr. Carroll discharged her two days later, on November 10, because he determined that she did not meet the standards for involuntary commitment under AS 47.30.700.[1]

On November 10, 2000, Greywolf filed a second written complaint against Dr. Carroll. She claimed that Dr. Carroll should not have discussed her case with the trooper who had brought her to Fairbanks Memorial Hospital on November 8 because there was not a "need to know." She also complained that she was denied Paxil, the medicine she usually takes, and that the denial of medication was detrimental to her. Greywolf's complaint was filed with the "manager," presumably of Fairbanks Memorial Hospital's mental health unit, and is stamped as having been witnessed by Dr. Carroll.

Four days later, on November 14, 2000, after discussing her options with a case manager at a community psychiatrist's office, Greywolf drove herself to Fairbanks Memorial Hospital and was admitted on an involuntary basis to the locked mental health unit.

She was again threatening suicide. Dr. Carroll's handwritten notes state that Greywolf "does appear to be more withdrawn." Greywolf reported at that time that she had not used illegal drugs and was compliant with her medications.

Because he had admitted Greywolf on an involuntary basis, Dr. Carroll applied for an ex parte order for seventy-two-hour detention for evaluation from the court under AS 47.30.700. Dr. Carroll wrote in the application that Greywolf was likely to cause serious harm to self or others and listed as facts to support the belief: "[patient] complaining of feeling suicidal with intent to harm herself." Superior Court Judge Charles R. Pengilly issued an ex parte order for seventy-two-hour detention for evaluation and appointment of attorney and mental health professionals.[2] That order included the direction that Greywolf "shall be examined at the evaluation facility by the locum tenens doctor at Fairbanks Memorial Hospital, a mental health professional and physician, and by Dr. Jane Krauss, a mental health professional within 24 hours of arrival at the facility."

Dr. Carroll's handwritten notes on November 15, 2000 state that Greywolf was angry that morning because she did not want to be in the closed unit and wanted more medication and a medical evaluation of "problems she can handle as an out-patient." Dr. Carroll wrote at this point that "[Greywolf] does not appear sad or depress[ed] today. She is more aptly described as simmering looking for a target for her rage." The nurses' patient care notes also state that Greywolf was angry on the morning of November 15 but that she had calmed down by the end of the day.

On November 16, 2000, Dr. Carroll changed Greywolf's admission status to voluntary.[3] The court then issued an order for

---

1. AS 47.30.700(b) provides:

   The petition required in (a) of this section must allege that the respondent is reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness and must specify the factual information on which that belief is based including the names and addresses of all persons known to the petitioner who have knowledge of those facts through personal observation.

2. The order was issued orally on November 14 and the date of the written order was November 15.

3. This change appears to have been initiated at 10:30 a.m. as noted in the nurses' patient care notes. The record contains an Application for

dismissal of the petition .for commitment. Greywolf does not contend that the statutory requirements were not followed at that time.

At about 2:45 p.m. on November 16, after Greywolf's change to voluntary status, the nurses' notes state that Greywolf became increasingly agitated and went into her room and curled up in the corner in a fetal position. She began to scream obscenities directed at the nurse and Dr. Carroll. Security was called. One of the nurses overheard Greywolf say that "when I go out again I'm taking someone with me." Greywolf became increasingly irate, threw her bedding and mattress around her room, and smashed a plastic cup against the nursing station window.

Although Dr. Carroll was not present in the unit, he was notified about Greywolf's increasing agitation. He arrived in the unit later in the day and spoke to Greywolf. Dr. Carroll testified that when he spoke to her, Greywolf said "something like, you know, 'I'm going to kill you'" and began making shooting sounds and tracking him with her finger as if aiming a gun. After Dr. Carroll left the unit, one of the nurses heard over the two-way intercom "what sounded like the patient imitating shooting a gun."

When Dr. Carroll returned to talk to Greywolf a second time at about 3:20 p.m. on November 16, she screamed profanities at him. Dr. Carroll's handwritten notes indicate that Greywolf was "[m]aking gestures that she wants to shoot me and saying she'll get me. Nothing specific enough to press assault charges." The nurses' notes stated that Greywolf's anger was particularly directed at Dr. Carroll because she felt she was not getting the medication she wanted. After Dr. Carroll left the unit to attend to another matter, a nurse succeeded in calming Greywolf down and she ate her evening meal at 6:00 p.m. But at around 7:00 p.m. Greywolf began banging her head against the wall and refused to agree not to harm herself. The nurses' notes state that Greywolf curled up in a fetal position and began to wail. Dr. Carroll was telephoned and he ordered over

the phone that Greywolf be given medication and be placed in four-point restraints to prevent self-harm.

Greywolf's status was then changed back to involuntary and the requisite paperwork completed. This time the order issued by the court ordered that respondent be examined "by locum tenens at Fairbanks Memorial Hospital, a mental health professional and physician, and by Dr. Steven Parker, a mental health professional, within 24 hours of arrival at the facility."

Dr. Carroll observed Greywolf in four-point restraints and wrote in his handwritten notes "[w]hen I went to check on [Greywolf] in four points, she appeared comfortable although she refused to talk to me. At the same time the night shift reported that she told the day staff that she was going to use her gun to kill herself and take someone with her." At 8:00 p.m., Dr. Carroll wrote an order to "[n]otify the supervisor immediately about this threat." At 8:00 p.m. one restraint was removed but Greywolf remained in three-point restraints. Those restraints were removed fully by 11:00 p.m.

On the morning of November 17, 2000, the nurses report that Greywolf was calm and that she said "I have nothing against the staff, it is the MD I'm angry at." Before Dr. Carroll arrived at the hospital that morning, he had already decided that he could no longer be Greywolf's psychiatrist and that the police should be called because of her threats. He spoke to a hospital administrator and stated that he could not continue working at Fairbanks Memorial Hospital if Greywolf remained a patient there. Dr. Carroll suggested that the police should be called, and told the administrator that Greywolf should have a physician assigned to her. Dr. Carroll stated that he probably also discussed with the administrator transferring Greywolf to another facility.

Although Dr. Carroll did not speak to Greywolf on November 17, he noted on the chart:

Voluntary Admission dated November 16, 2000 signed by Greywolf and a Notice of Voluntary

Admission signed by the hospital staff.

After yesterday's threat [and] today's lack of remorse, I can no longer function as her physician in any capacity. I hope that pressing charges against [her] will have some positive effect for her and end this endless violence and senseless rage.

At this point she appears totally committed to getting redress for what she sees as an endless series of injustices.

She has no interest in making any changes herself. She has never followed through with our aftercare plans. Instead she has insisted on displacing her rage onto me & others in mental health rather than face her fear of making any changes in her empty loveless life.

Fairbanks Police Department officers arrived around noon. Officer Korshin interviewed Dr. Carroll and described him as shaky and nervous. Officer Korshin also interviewed Greywolf, who denied having any intent to harm Dr. Carroll. Greywolf explained to the officer that she intended "I'll get you" to mean that she would sue Dr. Carroll for malpractice.

A statement from Dr. Carroll was taken on November 17, 2000. He wrote:

Yesterday, T.C. Greywolf threatened to kill me and I [am] afraid to be around her. After I made her a voluntary patient, I sat with her to discuss what else she needed before discharge. Instead she insisted on questioning my actions in past admissions. Particularly why I kept her on the locked unit and why I had not ordered medications when she demanded them. To be honest, I could not reply to her questions without looking at old charts. There have been so many admits that I could not say for sure.

I also wanted to focus on the present. That only made her angry. She became so verbally abusive that I became afraid she was going to attack me and backed out of the unit.

I later returned to see her but she was pummeling her fists and smashing dinnerware against the nurse's [station]. Once she settled down, I reentered the main room with a security guard nearby to talk with [her]. This time she demanded a witness in the room with us which I told her was not reasonable. Again she became enraged that I was not caring for her. As I backed out of the room she said [ ] repeatedly that she was going to get me. She kept [pantomiming] shooting me as I stood talking with the nurses.

Officer Korshin determined that there was probable cause to arrest Greywolf for assault based on his interviews with Dr. Carroll, two nurses, and Greywolf. When the officer explained the options of pressing charges or not, Dr. Carroll indicated that he wanted to press charges. Greywolf did not resist arrest and as she left the unit, she remarked to one of the nurses, "I guess you guys are rid of me now."

The District Attorney's office sought to indict Greywolf for assault in the third degree under AS 11.41.220. The grand jury heard from Dr. Carroll, the two nurses, and a police officer, and it returned an indictment for assault based on "repeated threats" under AS 11.41.220(a)(2). The superior court issued a restraining order against Greywolf that enjoined her from coming within 250 yards of Fairbanks Memorial Hospital or Dr. Carroll.

Greywolf was scheduled for a bail hearing on January 17, 2001 and Dr. Carroll wrote a three-page letter to Judge Richard D. Savell, the superior court judge hearing the request for release. The letter was written in response to "several issues which [Greywolf's] attorney glossed over that might be worthy of your time while considering her motion to be released without supervision or restriction." [4] Dr. Carroll expressed concern that Greywolf still had access to guns. Near the end of the letter, Dr. Carroll wrote "I have come to realize that she does not belong in the mental health system. No one in the state or V.A. mental health system knows how to deal with someone so lethal." Despite this letter, Greywolf appears to have been released at some point into the custody

---

4. It appears that this motion for release was heard in the court on the morning of January 17, 2001 and that Dr. Carroll was present, but had been unable to speak before the court because he had failed to inform the district attorney that he would appear.

of a third party, although the release order is not in the record.

Greywolf filed motions to dismiss the indictment, alleging that the facts did not establish probable cause for felony assault in the third degree charges. Those motions were denied. Greywolf's criminal trial was then held on April 3, 2001. After the state presented its case-in-chief, the defense moved for a judgment of acquittal. Judge Savell granted the motion and acquitted Greywolf.

In his ruling granting acquittal, Judge Savell identified four possible threats made by Greywolf. The first was the statement overheard by the nurse that the next time Greywolf shot herself, she was "not going out alone." The superior court ruled that this statement was not a true threat because it failed to meet the requirements of intent and imminence. The other three alleged threats were all statements or gestures made when Greywolf was agitated on November 16. Judge Savell stated:

> The court must determine that [the threat] was so unequivocal, unconditional, immediate, and specific as to the victim as to convey a gravity of purpose and imminent prospect of execution. The doctor was dealing with someone in a locked mental ward and he had the key. He had the ability on a phone call, and exercised that ability, to keep Ms. Greywolf confined. In fact, if anything, the ability he lacked was—and was frustrated in, was the ability to get rid of Ms. Greywolf from the ward.

Judge Savell therefore concluded that a reasonable jury could not find that Greywolf's statements were threats that would constitute assault under the statute. He also noted that the statute's requirement of "repeated" threats could not be met by statements and gestures made almost simultaneously.

After her acquittal, Greywolf sued Dr. Carroll for malicious prosecution [5] on December 31, 2001. She amended her complaint on October 29, 2002 to add claims for invasion of privacy against Dr. Carroll and claims against the City of Fairbanks for deprivation of federal and civil rights under 42 U.S.C. § 1983 and invasion of privacy.[6] A second amended complaint added a medical malpractice claim against Dr. Carroll to the claims from the first amended complaint.

Superior Court Judge Randy J. Olsen dismissed the malicious prosecution, abuse of process, and invasion of privacy claims on summary judgment on June 29, 2004. Greywolf's medical malpractice claim was allowed to proceed. On November 22, 2004, Judge Olsen dismissed with prejudice the medical malpractice claim on summary judgment based on the doctrine of absolute quasi-judicial immunity. Greywolf filed a motion for reconsideration that was denied by the trial court.

Greywolf now appeals the grant of summary judgment on her claims of malicious prosecution, abuse of process, invasion of privacy, and medical malpractice.

## III. STANDARD OF REVIEW

■ Summary judgment is granted if the pleadings, depositions, or other admissible evidence along with affidavits show that there is no genuine issue of material fact and that a party is entitled to judgment as a matter of law.[7] We review a grant of summary judgment de novo [8] and in so doing draw all reasonable inferences in favor of the nonmoving party to determine "whether the parties genuinely dispute any facts material to a viable legal theory and, if not, whether the undisputed facts entitle the movant to judgment as a matter of law." [9]

---

5. This claim was eventually treated as one for both malicious prosecution and abuse of process.

6. The claims against the City of Fairbanks were dismissed on summary judgment on July 29, 2004 and Greywolf has not appealed that judgment.

7. Alaska R. Civ. P. 56(c).

8. *Snyder v. Am. Legion Spenard Post No. 28*, 119 P.3d 996, 1001 (Alaska 2005).

9. *Preblich v. Zorea*, 996 P.2d 730, 733 (Alaska 2000) (quoting *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1200 (Alaska 1998)).

▉ "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[10] The movant has the burden of showing that there is an absence of a factual dispute on a material fact[11] and that this absence of a dispute constitutes a failure of proof on an essential element.[12] If a prima facie case is established by the movant, then the nonmoving party must set forth specific facts showing that admissible evidence could be produced that reasonably tends to dispute or contradict the moving party's evidence in order to demonstrate the existence of a dispute of material fact and prevent entry of summary judgment.[13] Any admissible evidence in favor of the nonmoving party concerning a material fact is sufficient to render summary judgment inappropriate.[14]

▉ Whether probable cause exists is a mixed question of law and fact.[15] In the absence of clear error, we accept the factual findings of the trial court.[16] Once the historical facts have been established, the existence or absence of probable cause is "a purely legal question" that we review de novo.[17] The question of whether immunity exists as a defense to a claim is also a matter of law reviewed de novo.[18]

## IV. DISCUSSION

### A. Malicious Prosecution

▉ At trial, Greywolf claimed that Dr. Carroll "maliciously, and without probable cause," caused her wrongful arrest knowing "that he had insufficient information to justify causing [Greywolf's] arrest." The following elements are required to maintain a cause of action for the tort of malicious prosecution:

(1) a criminal proceeding instituted or continued by the defendant against the plaintiff;

(2) termination of the proceeding in favor of the plaintiff;

(3) absence of probable cause for the proceeding; and

(4) "malice" or a primary purpose other than that of bringing an offender to justice.[19]

The superior court found sufficient participation by Dr. Carroll in the initiation of the criminal proceedings to preserve the cause of action on the first element. That the criminal case terminated in favor of Greywolf is uncontested. The superior court also found that there were questions of fact that prevented summary judgment for Dr. Carroll on the fourth element requiring "malice." But because the trial court concluded that there was probable cause to believe a crime had been committed and that Dr. Carroll was justified in calling the police to make a report and ask for an investigation, it granted summary judgment to Dr. Carroll on the malicious prosecution claim.

The superior court found the following facts to be undisputed: (1) that Greywolf had recently demonstrated both the means and capacity to use a gun on herself in her attempted suicide in September; (2) that she had declared an intention to take someone

---

10. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Hinsberger v. State*, 53 P.3d 568, 571–73 (Alaska 2002) (affirming summary judgment against plaintiff where plaintiff failed to show he could prove one element of the claim).

11. *Shade v. Co & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995).

12. *See, e.g., Dansereau v. Ulmer*, 903 P.2d 555, 570–71 (Alaska 1995).

13. *Preblich*, 996 P.2d at 733.

14. *Meyer v. State, Dep't of Revenue, Child Support Enforcement Div. ex rel. N.G.T.*, 994 P.2d 365, 367 (Alaska 1999).

15. *Matter of J.A.*, 962 P.2d 173, 175 (Alaska 1998).

16. *Id.*

17. *Id.*

18. *State, Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 456 (Alaska 1997).

19. *Stephens v. State, Dep't of Revenue*, 746 P.2d 908, 911 (Alaska 1987); *see also Brown v. Ely*, 14 P.3d 257, 262–63 n. 37 (Alaska 2000); RESTATEMENT (SECOND) OF TORTS § 653 (1977).

with her the next time she attempted suicide; (3) that she had told Dr. Carroll that she was going to "get" him; and (4) that she had mimicked shooting him. Although she emphasizes other facts in her argument, Greywolf does not offer any evidence to establish a genuine dispute as to these underlying facts. But Greywolf does argue that probable cause did not exist for her arrest because Dr. Carroll knowingly supplied false information to the arresting officer.

■■■■ It is a settled rule that an arresting officer's exercise of his or her independent discretion in initiating and maintaining the prosecution is a complete defense to an action for malicious prosecution.[20] But if a private person makes an accusation of criminal misconduct about another to an official, the person must believe that the accusation or information is true.[21] If the person knows the information to be false, "an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information."[22] To survive summary judgment, then, Greywolf must show that there is a genuine issue of material fact whether Dr. Carroll in good faith believed his own statements to the police or whether he deliberately misled the police by suggesting that the situation was more serious than it was.

Greywolf first claims that Dr. Carroll himself believed that there was no probable cause for arrest. Greywolf's argument is based on the fact that after she threatened Dr. Carroll on November 16, 2000, Dr. Carroll wrote in his notes that Greywolf had done "[n]othing specific enough to press assault charges." Greywolf claims that this note "is [Dr.] Carroll's admission that he lacked probable cause to accuse or press assault charges against Greywolf." But Dr. Carroll testified that he made this note prior to hearing from the staff of the night shift that Greywolf told the day staff that "she was going to use her gun to kill herself and take someone with her." Upon hearing about this threat from the night shift, Dr. Carroll made an additional note to "[n]otify the administration supervisor immediately about this threat." Dr. Carroll also explained before the grand jury that it was this additional information that caused him to decide to consult the police. But Dr. Carroll's testimony on this point was disputed. One of the day nurses testified to the grand jury that she told Dr. Carroll about Greywolf's threat during the day, before the note was written. Because we are reviewing a grant of summary judgment to Dr. Carroll, all factual inferences must be made in favor of the nonmoving party, Greywolf. However, Dr. Carroll is not a law enforcement official, and at most, his note represents his lay opinion regarding whether assault charges were appropriate. As the trial court noted: "[Dr.] Carroll cannot be charged with knowing the law, nor deciding on the degree of assault to be charged and the elements of each." Thus, Dr. Carroll's lay assessment of whether the facts known to him were sufficient to support an assault charge does not create a genuine issue of material fact. And as there is no genuine issue of material fact regarding whether Dr. Carroll believed that the facts he provided to the police were true, the grant of summary judgment was appropriate.

Greywolf then relies on statements made by Officer Korshin at deposition to argue that Officer Korshin would not have made the arrest on November 17 had he known that Greywolf's threats had been made the previous day. But Officer Korshin also testified that no one told him that the events occurred on November 17, as opposed to November 16, and that he had merely assumed it. And the written statement Dr. Carroll gave Officer Korshin on November 17 clearly indicated that the events described had occurred on November 16. Officer Korshin also testified that Dr. Carroll did not appear anxious to have Greywolf arrested and that Dr. Carroll appeared to be genuinely scared. Finally, Officer Korshin made his decision to arrest after talking to Dr. Carroll, two nurses, and to Greywolf herself, and did not simply rely on Dr. Carroll's information.

**20.** Restatement (Second) of Torts § 653 cmt. g (1977).

**21.** *Id.*

**22.** *Id.*

Therefore, the record supports the conclusion that Officer Korshin independently determined that there was probable cause to arrest.

Probable cause to arrest does not require an "actual showing that [criminal] activity occurred" but "requires only a fair probability or substantial chance of criminal activity." [23] "Probable cause to arrest exists if the facts and circumstances known to the officer would support a reasonable belief that an offense has been or is being committed by the suspect." [24] Although Greywolf's actions on November 16 were eventually determined not to constitute assault in the third degree, we conclude that the facts as Officer Korshin knew them on November 17 were sufficient to establish probable cause to arrest. Therefore, the superior court correctly granted summary judgment to Dr. Carroll on the claim of malicious prosecution.

### B. Abuse of Process

Even if a malicious prosecution claim cannot be sustained because there was probable cause to arrest, a claim for abuse of process may still remain. In her complaint, Greywolf alleged that Dr. Carroll pursued the assault charge "for reasons other than to bring [Greywolf] to justice." The Restatement (Second) of Torts defines abuse of process as the misuse of a legal process against another primarily to accomplish a purpose for which it was not designed. [25] Alaska law requires two elements for the claim:

(1) ulterior purpose independent from the process, and

(2) a willful act in the use of the process that is not proper in the regular conduct of the proceeding. [26]

The ulterior purpose must be the primary purpose for the defendant's use of the process. [27] Unlike malicious prosecution, abuse of process does not require that probable cause be lacking [28] and also does not require termination in favor of the accused. [29]

On the first element, the superior court found there to be a genuine issue of material fact as to whether "[Dr.] Carroll had an ulterior purpose of having Greywolf removed from the mental health unit and discouraged from using mental health services at [Fairbanks Memorial Hospital]." The superior court pointed out that Greywolf had a well-established diagnosis of Post Traumatic Stress Disorder and that, in the opinion of Greywolf's expert, her behavior on November 16 was consistent with that diagnosis. The superior court also took note of the opinion of Greywolf's expert that characterized Dr. Carroll's behavior as an attempt to criminalize Greywolf's mental illness as the result of a "personal conflict" with her. The superior court found that portions of Dr. Carroll's testimony before the grand jury and at trial reflected "strong antipathy" toward Greywolf and that it was arguable whether Dr. Carroll "viewed arrest and jail as some form of punitive treatment for [Greywolf's] violent outbursts on the mental health unit." The superior court also took note of the fact that Dr. Carroll stated in his deposition that "it was time to try a different system, the criminal justice system, in Greywolf's case." Given these facts, the superior court concluded that reasonable jurors could disagree as to whether Dr. Carroll used criminal proceedings to "get rid" of Greywolf from his unit at Fairbanks Memorial Hospital.

But the superior court found that there was no issue of material fact on the second element, requiring a "willful act in the

**23.** *Van Sandt v. Brown,* 944 P.2d 449, 452 (Alaska 1997) (citations omitted).

**24.** *State v. Joubert,* 20 P.3d 1115, 1118–19 (Alaska 2001).

**25.** Restatement (Second) of Torts § 682 (1977).

**26.** *Sands v. Living Word Fellowship,* 34 P.3d 955, 961 (Alaska 2001); *see also Jenkins v. Daniels,* 751 P.2d 19, 22 (Alaska 1988).

**27.** Restatement (Second) Torts § 682, cmt. b (1977).

**28.** Restatement (Second) Torts § 682, cmt. a (1977).

**29.** *Jenkins,* 751 P.2d at 20, 22.

use of the process that is not proper in the regular conduct of the proceeding."[30] As we explained in *Hayes v. A.J. Associates, Inc.*, even if a lawsuit were filed for an improper purpose, the mere act of filing suit is not sufficient for an abuse of process action.[31] Furthermore, we have recognized that actions taken in the regular course of litigation such as testifying before the grand jury or at trial also cannot form a proper basis for an abuse of process claim.[32]

In order to prevail, then, Greywolf must show that Dr. Carroll undertook a separate act in addition to the initiation of the proceedings, which amounted to a misuse of those proceedings.[33] "The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it."[34] In *Sands v. Living Word Fellowship*, we provided three examples of a willful act: (1) offering to discontinue a proceeding in return for a payment of money; (2) filing a lien to force the plaintiff to pay off an unrelated debt; or (3) causing an arrest and confinement in order to intimidate the plaintiff.[35]

Greywolf argues that the letter written by Dr. Carroll addressed to Judge Savell and filed on January 25, 2001 constituted a willful act because it evidenced an attempt by Dr. Carroll to cause, improperly, the "arrest and confinement [of the plaintiff] to intimidate the plaintiff."[36] But AS 12.61.010(a)(2), as part of Alaska's Crime Victim's Rights Act,[37] entitled Dr. Carroll to be notified of bail hearings[38] and article 1, section 24 of the Alaska Constitution provides that a victim has the right to be heard "at any proceeding where the accused's release from custody is considered."[39] Dr. Carroll's letter is thus within the limits anticipated for his participation in the proceedings as a victim. Greywolf therefore failed to raise a genuine issue of material fact on this element and we affirm the grant of summary judgment to Dr. Carroll on the abuse of process claim.

## C. Invasion of Privacy

■ Greywolf's complaint claimed that Dr. Carroll intentionally invaded Greywolf's "solitude, seclusion ... private affairs or concerns by contacting and summoning third persons into [ ] Greywolf's private and secluded area" while she was in the Fairbanks Memorial Hospital locked mental health unit. Alaska law recognizes the claim for invasion of privacy based on the Restatement (Second) of Torts § 652B.[40] Section 652B reads:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable

30. *Sands,* 34 P.3d at 961.

31. 960 P.2d 556, 571 (Alaska 1998).

32. *Meidinger v. Koniag, Inc.*, 31 P.3d 77, 86 (Alaska 2001).

33. *Sands,* 34 P.3d at 961.

34. Restatement (Second) of Torts § 682, cmt. b (1977).

35. 34 P.3d at 961.

36. *Id.*

37. Ch. 59, SLA 1989.

38. AS 12.61.010 provides:
    (a) Victims of crimes have the following rights:
    ....

(2) the right to be notified by the appropriate law enforcement agency or the prosecuting attorney of the date of trial, sentencing, including a proceeding before a three-judge panel under AS 12.55.175, an appeal, and any hearing in which the defendant's release from custody is considered[.]

39. Article 1, section 24 states in pertinent part:
    Crime victims, as defined by law, shall have the following rights as provided by law: ... the right to obtain information about and be allowed to be present at all criminal or juvenile proceedings where the accused has the right to be present; [and] the right to be allowed to be heard, upon request, at sentencing, before or after conviction or juvenile adjudication, and at any proceeding where the accused's release from custody is considered.

40. *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1133 (Alaska 1989).

person.[41]

Two elements are required:

(1) that plaintiff had a reasonable expectation of privacy, and

(2) that defendant intruded in a manner highly offensive to a reasonable person.[42]

The superior court found that Greywolf had failed to make out a genuine issue of material fact on either element.

■ Greywolf concentrates her argument on the second element, maintaining that the police intruded in a manner highly offensive to a reasonable person. Greywolf argues that the superior court erred when it found that "[a] reasonable person who was a patient in a locked mental health unit would not be highly offended by the actions of the police under the circumstances" because whether she was "highly offended" is a factual question for the jury. But the "reasonable person" standard has both subjective and objective elements. While the question whether Greywolf was "highly offended" is a factual question for the jury, whether it is reasonable for her to have been highly offended is a different matter.[43]

First, we note that the invasion of privacy principle cannot shield a person from investigations by the police unless the investigation is carried out in an offensive manner. In *Luedtke v. Nabors Alaska Drilling, Inc.*, we

explained that "courts have construed 'offensive intrusion' to require either an unreasonable manner of intrusion, or intrusion for an unwarranted purpose."[44] The illustrations in the comments to the Restatement (Second) of Torts § 652B indicate that it must be an exceptional kind of prying into another's private affairs to constitute a highly offensive intrusion.[45] Here, Greywolf merely argues that because the Patient's Bill of Rights of Fairbanks Memorial Hospital provides that "[t]hose not directly involved in ... care must have the permission of the patient to be present" and because she did not give permission to the police to be present, a genuine issue of material fact exists as to whether the intrusion was highly offensive. But Greywolf impliedly consented to the interview with Officer Korshin when she answered his questions without objection.[46] Furthermore, the police entered the mental health unit for the purpose of fulfilling their duty to respond and investigate when summoned.[47] The record does not indicate anything unreasonable in the conduct of the investigators and Greywolf does not claim that she was intimidated by the police. As a matter of law, the orderly performance of the police officers' duties in this case does not constitute an unreasonable manner of intrusion nor an intrusion for an unwarranted purpose.

■ Greywolf also fails to establish that she had a reasonable expectation of privacy.

---

**41.** RESTATEMENT (SECOND) OF TORTS § 652B (1977).

**42.** *See, e.g., Med. Lab. Consultants v. Amer. Broad. Co.*, 306 F.3d 806, 812–13 (9th Cir.2002).

**43.** *See, e.g., State v. Page*, 911 P.2d 513, 515–16 (Alaska App.1996).

**44.** 768 P.2d at 1137; *see also Wal–Mart, Inc. v. Stewart*, 990 P.2d 626, 632 (Alaska 1999).

**45.** *See* RESTATEMENT (SECOND) OF TORTS § 652B, cmt. b (1977) (The intrusion may be a physical intrusion "into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home." The illustrations offer, among other things, the following examples: (1) taking the photograph of a woman in the hospital with a "rare disease that arouses public curiosity" over her objection, and (2) using a telescope to look into someone's upstairs bedroom window for two weeks and taking "intimate pictures" with a telescopic lens.).

**46.** *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 849, 865 P.2d 633 (1994) ("[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant. If voluntary consent is present, a defendant's conduct will rarely be deemed 'highly offensive to a reasonable person' so as to justify tort liability.") (citing RESTATEMENT (SECOND) OF TORTS § 652B, cmt. c).

**47.** *See, e.g., Bauman v. State, Div. of Family & Youth Servs.*, 768 P.2d 1097, 1100 (Alaska 1989) (Actions of police officer in response to what was eventually determined to be a false and maliciously slanderous report of child abuse not actionable because police officer acted in good faith and in an orderly manner, within the scope of his duty to investigate.).

Again, she argues that the question is a factual one for the jury. While the subjective element—whether Greywolf herself had an expectation of privacy—may present a question of fact for the jury, the objective element—whether it was reasonable for her to have that expectation—presents a question of law.[48] Greywolf's argument relies solely on the Patient's Bill of Rights at Fairbanks Memorial Hospital that states "[t]he patient has the right to every consideration of his privacy concerning his own medical care program." But the plain language of this provision does not state that this expectation of privacy is absolute or that it excludes law enforcement or security from entering the locked unit for the purposes of investigating possible criminal misconduct. The police were privileged to enter the mental health unit because they had a duty to respond and investigate when summoned.[49] And Greywolf does not provide evidence to show that she had the right to exclude others from her room, a factor commonly considered in determining whether a person's expectation of privacy was reasonable.[50] Because Greywolf cannot establish that she had a reasonable expectation of privacy or that the intrusion was unreasonable in manner or purpose, we affirm the grant of summary judgment to Dr. Carroll on the invasion of privacy claim.

### D. Medical Malpractice

In her medical malpractice claim, Greywolf complains of several acts or omissions. Greywolf argues that "[Dr.] Carroll's change of Greywolf's admission status to involuntary [on November 16] was done in bad faith." She also faults "[Dr.] Carroll's refusal to provide medical care to Greywolf on Novem-

ber 17, 2000; [Dr.] Carroll's corresponding decision to press criminal charges against Greywolf, a mental health patient under his care; and [Dr.] Carroll's corresponding discharge of his patient to a jail in violation of AS 47.30.705(a)." Greywolf further complains of Dr. Carroll's failure to provide her a discharge plan "specifying the kinds and amount of care and treatment Greywolf should have after discharge, and such other steps as Greywolf might take to benefit her mental health after leaving the facility" as required under AS 47.30.825(I). The superior court granted Dr. Carroll summary judgment on the medical malpractice claim based on the doctrine of quasi-judicial immunity. We affirm.

We recognized the doctrine of absolute quasi-judicial immunity in *Lythgoe v. Guinn.*[51] In *Lythgoe,* immunity was granted to a court-appointed psychologist who was acting as an independent custody investigator in a divorce proceeding.[52] As we explained in *Lythgoe,* the doctrine of absolute quasi-judicial immunity is derived from that of absolute judicial immunity. Thus, "persons, other than judges, who perform judicial functions are granted immunity coextensive with that accorded judges."[53] This form of immunity is absolute and it applies "no matter how erroneous the act may have been, how injurious its consequences, how informal the proceeding, or how malicious the motive. Only judicial actions taken in the clear absence of all jurisdiction will deprive a judge of absolute immunity."[54] In a case granting court-appointed psychiatrists absolute immunity, the Hawaii Supreme Court noted that "[i]n adopting this position, we do not condone negligence by persons in the performance of their duties or their failure to abide

48. *Page,* 911 P.2d at 515–16.

49. *See, e.g., Bauman,* 768 P.2d at 1100.

50. *See, e.g., State v. Thompson,* 222 Wis.2d 179, 585 N.W.2d 905, 908–10 (App.1998).

51. 884 P.2d 1085 (Alaska 1994).

52. *Id.* at 1086.

53. *Id.* at 1087.

54. *Trapp v. State,* 53 P.3d 1128, 1130 (Alaska 2002) (quoting *Cok v. Cosentino,* 876 F.2d 1, 2

(1st Cir.1989)). The Supreme Court of the United States has noted: "[t]he procedural difference between the absolute and the qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial." *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

by a court order. The grant of absolute immunity is not intended to permit the doctors to hide behind the judicial shield. Rather, our position is necessary to maintain the orderly administration of the judicial process." [55]

In *Lythgoe*, we pointed to several policy grounds used by other courts in adopting the doctrine of quasi-judicial immunity, including

(1) the need to save judicial time in defending suits; (2) the need for finality in the resolution of disputes; (3) to prevent deterring competent persons from taking office; (4) to prevent the threat of lawsuit from discouraging independent action; and (5) the existence of adequate procedural safeguards such as change of venue and appellate review. [56]

■ Greywolf first argues that Dr. Carroll cannot enjoy immunity under the doctrine of absolute quasi-judicial immunity because he was not "performing a function pursuant to a court directive related to the judicial process" [57] on November 17. She argues that "[t]he happenstance of the existence of a court order on November 17, 2000, caused by [Dr.] Carroll's medical decisions toward Greywolf on November 16, 2000, cannot shield [Dr.] Carroll's medical malpractice on November 17, 2000." But in *Karen L. v. State, Department of Health & Social Services, Division of Family & Youth Services,* we noted that it is irrelevant how a doctor came to be appointed by the court because "[w]e have recognized that it is not 'how the psychologist was first chosen but whether his activity is an integral part of the judicial process so that to deny immunity would dis-serve the broader public interest that non-judicial officers act without fear of liability.'" [58] Thus, the question in this case does not turn on whether Dr. Carroll's own actions caused his appointment, but whether, once appointed, the actions he took were an integral part of the judicial process.

Greywolf's alternative argument claims that Dr. Carroll's actions on November 17 are not entitled to quasi-judicial immunity because they were not an integral part of the judicial process. Greywolf argues that Dr. Carroll's acts were "ministerial" and that they fell outside or were contrary to the court order. But the superior court order provided that "the respondent shall be examined at the evaluation facility by locum tenens at Fairbanks Memorial Hospital." And Greywolf does not challenge Dr. Carroll's status as the locum tenens when the ex parte orders of November 16 and 17 were issued. Nor does she allege that the court lacked jurisdiction to appoint the locum tenens at Fairbanks Memorial Hospital to her case. Greywolf instead complains that her status on November 16 was changed for malicious reasons and that she was wrongfully discharged on November 17 without a treatment plan. But her complaint about her discharge to jail relies on her unsuccessful claim for malicious prosecution. And Dr. Carroll was appointed by the ex parte order orally issued on November 16 to evaluate Greywolf's mental health and to make recommendations regarding whether she should be released or committed involuntarily pursuant to AS 47.30.700, [59] AS 47.30.705, [60] AS

---

**55.** *Seibel v. Kemble*, 63 Haw. 516, 631 P.2d 173, 177 (1981). Essential to the court's reasoning was the fact that there were other ways to hold a court's agents accountable for their actions, including the imposition of sanctions, such as reporting the doctor to the medical boards or prohibiting the doctor from further service to the court. *Id.* at 177 n. 8.

**56.** 884 P.2d at 1089 (quoting *Lavit v. Superior Court*, 173 Ariz. 96, 839 P.2d 1141, 1144 (App. 1992)).

**57.** *Id.* at 1088 (quoting *Lavit*, 839 P.2d at 1144).

**58.** 953 P.2d 871, 878 (quoting *Lythgoe*, 884 P.2d at 1088).

**59.** AS 47.30.700, "Initiation of involuntary commitment procedures," provides:

(a) Upon petition of any adult, a judge shall immediately conduct a screening investigation or direct a local mental health professional employed by the department or by a local mental health program that receives money from the department under AS 47.30.520–47.30.620 or another mental health professional designated by the judge, to conduct a screening investigation of the person alleged to be mentally ill and, as a result of that condition, alleged to be gravely disabled or to present a likelihood of serious harm to self or others. Within 48 hours after the completion of the screening investigation, a judge may issue an ex parte order orally or in writing,

47.30.710,[61] and AS 47.30.720.[62] The evaluation of Greywolf required Dr. Carroll to decide whether to change Greywolf's status and whether she could be discharged. Thus, Greywolf's allegations that Dr. Carroll improperly discharged her on November 17 without providing her with an aftercare plan, as required under AS 47.30.825(I), are complaints about acts that are integrally linked to Dr. Carroll's judicially appointed function to evaluate Greywolf's mental health and to decide whether she should be committed or released. Absolute quasi-judicial immunity applies "no matter how erroneous the act may have been, how injurious its consequences, how informal the proceeding, or how malicious the motive."[63] In this case, although Dr. Carroll may not have followed proper procedure when evaluating Greywolf and making the decision to discharge her, his acts remain squarely within his discretionary jurisdiction as a court-appointed psychiatrist.

stating that there is probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others. The court shall provide findings on which the conclusion is based, appoint an attorney to represent the respondent, and may direct that a peace officer take the respondent into custody and deliver the respondent to the nearest appropriate facility for emergency examination or treatment. The ex parte order shall be provided to the respondent and made a part of the respondent's clinical record. The court shall confirm an oral order in writing within 24 hours after it is issued.

(b) The petition required in (a) of this section must allege that the respondent is reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness and must specify the factual information on which that belief is based including the names and addresses of all persons known to the petitioner who have knowledge of those facts through personal observation.

60. AS 47.30.705, "Emergency detention for evaluation," provides:

(a) A peace officer, a psychiatrist or physician who is licensed to practice in this state or employed by the federal government, or a clinical psychologist licensed by the state Board of Psychologist and Psychological Associate Examiners who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700, may cause the person to be taken into custody and delivered to the nearest evaluation facility. A person taken into custody for emergency evaluation may not be placed in a jail or other correctional facility except for protective custody purposes and only while awaiting transportation to a treatment facility. However, emergency protective custody under this section may not include placement of a minor in a jail or secure facility. The peace officer or mental health professional shall complete an application for examination of the person in custody and be interviewed by a mental health professional at the facility.

(b) In this section, "minor" means an individual who is under 18 years of age.

61. AS 47.30.710, "Examination," provides:

(a) A respondent who is delivered under AS 47.30.700–47.30.705 to an evaluation facility for emergency examination and treatment shall be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival at the facility.

(b) If the mental health professional who performs the emergency examination has reason to believe that the respondent is (1) mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others, and (2) is in need of care or treatment, the mental health professional may hospitalize the respondent, or arrange for hospitalization, on an emergency basis. If a judicial order has not been obtained under AS 47.30.700, the mental health professional shall apply for an ex parte order authorizing hospitalization for evaluation.

62. AS 47.30.720, "Release before expiration of 72–hour period," provides:

If at any time in the course of the 72–hour period the mental health professionals conducting the evaluation determine that the respondent does not meet the standards for commitment specified in AS 47.30.700, the respondent shall be discharged from the facility or the place of evaluation by evaluation personnel and the petitioner and the court so notified.

63. *Trapp*, 53 P.3d at 1130 (quoting *Cok*, 876 F.2d at 2).

## V. CONCLUSION

For the foregoing reasons, the judgment of the superior court is AFFIRMED in all respects.

EASTAUGH, Justice, not participating.