*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARCIE A. BEISTLINE and WILLIAM C. BEISTLINE, | ) ) ) | Supreme Court No. S-17556 |
| Appellants, | ) ) | Superior Court No. 4FA-18-01401 CI |
| v. | ) ) | O P I N I O N |
| BRUCE M. FOOTIT and BANNER HEALTH INC., d/b/a FAIRBANKS MEMORIAL HOSPITAL, | ) ) ) ) | No. 7518 – April 23, 2021 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Mike A. Stepovich, Stepovich Law Office, Fairbanks, for Appellants. John J. Tiemessen, Clapp Peterson Tiemessen Thorsness LLC, Fairbanks, for Appellees.

Before: Bolger, Chief Justice, Maassen, Carney, and Borghesan, Justices. [Winfree, Justice, not participating.]

MAASSEN, Justice.

## I.      INTRODUCTION

A husband and wife sued medical care providers after the wife suffered a seizure, allegedly due to a doctor's decision to abruptly discontinue her medication. The

superior court granted summary judgment to the medical care providers, ruling that the couple's only expert witness, a pharmacist, was unqualified to provide testimony about the matter at issue because he was not a doctor of internal medicine and was not board-certified in the doctor's field or specialty. The couple appeals.

We conclude that the pharmacist's testimony was not sufficient to create a genuine issue of material fact about the relevant standard of care. We therefore affirm the grant of summary judgment to the health care providers.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

On February 6, 2016, William Beistline brought his wife Marcie to the Fairbanks Memorial Hospital emergency room with "generalized weakness, ataxia and confusion." Marcie was admitted to the hospital by Dr. Bruce M. Footit, a hospitalist and internist who is board-certified in internal medicine.[1] William provided his wife's medical history, as she was "too delirious" to do it herself.

Dr. Footit's written record includes the following information. In the days leading up to Marcie's admission, she had "been acting strangely, experiencing

---

[1]    The complaint alleges that Dr. Footit is an "internist," which his answer admits. The only other direct evidence in the record of Dr. Footit's title and qualifications appears to be an unauthenticated copy of his curriculum vitae (CV), submitted by the defendants with their reply in support of summary judgment. The CV states that Dr. Footit is certified by the American Board of Internal Medicine and identifies his position with Fairbanks Memorial Hospital in the relevant time frame as "Hospitalist/Critical Care Provider." The Beistlines' expert, like the defendants', assumed that Dr. Footit was "a board certified internal medicine physician" when opining about the applicable standard of care. The Beistlines' argument makes the same assumption; they do not directly challenge the superior court's factual premise that Dr. Footit is "a board-certified internist practicing internal medicine." We therefore assume that the doctor's training and qualifications are undisputed for purposes of the issue on appeal.

increasing confusion[,] lethargy," and "unstead[iness] on her feet," and was dealing with nausea, vomiting, and diarrhea. She had previously received some "very unorthodox" and "fairly nontraditional" treatments for "common medical problems" from "medical professionals" outside of Alaska. They had been treating her for Lyme disease "at [a] significant cost" and had also surgically implanted a port in her chest so she could self-administer "vitamin bags," but these Outside providers did not give her any "followup or direct care for her port." Marcie saw these providers annually and received "sporadic treatment" consisting of vitamin IV bags and "allopathic treatments for her insomnia, which [she] takes per her own regimen, which include: Ambien, benzodiazepines, muscle relaxants and other herbal remedies."

One of Marcie's providers, "Dr. Fry," had diagnosed her with a "blood parasite," which was now "crawling out of her skin," causing itchiness and skin lesions. William explained that Dr. Fry had prescribed an antibiotic, but according to Dr. Footit's notes it was actually some type of "herbal remedy that only [Dr. Fry was] able to prescribe at [a] significant cost." Marcie's medical history also appeared to include depression, "potential psychiatric disease," and chronic insomnia. No documentation was available to Dr. Footit about what was in the vitamin bags or the dosage or frequency of Marcie's medications; according to William, she was "somewhat secretive [about] her therapies." She had "a box full of different medications," but Dr. Footit could not determine which ones she was taking.

Dr. Footit believed that Marcie had "multiple chronic issues" including acute hyponatremia[2] and delirium — possibly related to the hyponatremia — and

---

[2]     "Hyponatremia 'is the term used to describe abnormally low amounts of sodium in the blood.' " *Salt and Sodium*, HARVARD SCHOOL OF PUBLIC HEALTH, https://www.hsph.harvard.edu/nutritionsource/salt-and-sodium/ (last visited Mar. 3, 2021).

excessive medication use. Because she had no local physician in Alaska and had sought what Dr. Footit believed to be unorthodox and "frankly potentially dangerous medical therapies" without any significant oversight, Dr. Footit found it difficult to diagnose the causes of her problems. But he believed her to be "at significant risk for unintentionally overdosing on her [regimen] of [central nervous system]-active meds." He ordered a hold on her "chronic outpatient medications" and herbal remedies. He planned to give her "some IV fluid resuscitation" and "isotonic saline" to correct her sodium levels while monitoring her progress over a 24-hour period. He also planned a toxicology screen; an initial opiate screen was positive, which he found concerning because she did not appear to have any prescriptions for opiates.

The next day, February 7, a surgeon removed Marcie's implanted port, having determined that her change in mental status was "most likely secondary to early sepsis/bacteremia." On February 9 Marcie had a tonic-clonic seizure[3] and was transferred to the Intensive Care Unit. Three days later she was discharged for outpatient treatment.

## B. Proceedings

In early 2018 the Beistlines filed a medical malpractice suit against Dr. Footit and Banner Health, d/b/a Fairbanks Memorial Hospital. They alleged that Marcie's tonic-clonic seizure was the result of Dr. Footit's decision to cut off all her

---

[3] A tonic-clonic seizure is generally characterized by a sudden stiffening of the muscles, loss of consciousness, and convulsions. *Tonic-clonic Seizures*, EPILEPSY FOUNDATION, https://www.epilepsy.com/learn/types-seizures/ tonic-clonic-seizures (last visited Mar. 17, 2021).

medications, including benzodiazepines,[4] and that this decision breached the applicable standard of care.

Dr. Footit and the hospital moved for summary judgment in January 2019, almost a year after the complaint was filed. They supported their motion with the affidavit of Dr. Thomas McIlraith, a licensed and board-certified internal medicine physician. Dr. McIlraith noted that Dr. Footit lacked any records of Marcie's "unorthodox treatments, drugs, drug dosages, [and] drug frequency [or of] the rationale and diagnoses for the unusual and unconventional unorthodox treatments." He attested that because Marcie was delirious, "[t]he standard of care require[d] that potential causes of the pathology be treated and eliminated." He explained that Dr. Footit did this by first "correcting the hyponatremia and treating the sepsis from the implanted port." He further attested that "because Marcie was on medications that could cause delirium, in prescribed dosages exceeding recommended amounts, and because Dr. Footit could not ascertain how Marcie was taking her medications," Dr. Footit acted competently by withdrawing them; in fact, Dr. McIlraith asserted, "[i]t would be irresponsible NOT to eliminate a potential drug cause of delirium."[5] Finally, he concluded that "Dr. Footit met the standard of care and acted as a reasonable and prudent internist" and that the hospital's "staff met the appropriate and applicable standard of care."

---

[4] Benzodiazepines are a class of drug used as sedatives and to treat insomnia, anxiety, muscle spasms, and drug withdrawal symptoms. *Benzodiazepines (and the Alternatives)*, Harvard Health Publishing, https://www.health.harvard.edu/mind-and-mood/benzodiazepines_and_the_alternatives (last updated Sept. 27, 2020).

[5] Dr. McIlraith disputed the complaint's assertion that Dr. Footit had discontinued benzodiazapenes. This factual dispute was not material to the summary judgment ruling on appeal.

The Beistlines were granted an unopposed 10-day extension of time to respond to the summary judgment motion. They then moved pursuant to Alaska Civil Rule 56(f) for a 45-day continuance to obtain supporting affidavits.[6] The 45 days passed, but the court heard argument on the Rule 56(f) motion in April, when it addressed several other discovery issues as well. The court observed that it had "been three years since the incident, a year since the start of the case, and the suggestion [from the defendants] is that the plaintiffs still don't even have an expert and . . . also, that the plaintiffs have been dilatory in discovery." The Beistlines' counsel conceded that they did not yet have an expert and did not know "who [would] actually be [their] testifying expert at trial," but she argued that they were not required to disclose their experts before the pretrial deadline for such disclosures — still eight months away — notwithstanding the pending summary judgment motion. At the close of the hearing the court found that the plaintiffs had been seeking continuances as "a strategic matter" and that they had "indeed been dilatory during discovery," but it allowed them two more weeks to acquire an expert "based solely on the interest in resolving this case on the merits."

The Beistlines then filed an opposition to the summary judgment motion that relied solely on the affidavit of Dr. Gregory Holmquist, a pharmacist and educator. Dr. Holmquist, unlike Dr. McIlraith, assumed that Dr. Footit had discontinued Marcie's use of benzodiazepine drugs and Ambien, which Dr. Holmquist characterized as a "Z-drug." Dr. Holmquist attested that there were strict protocols governing how patients were removed from these drugs, and that a failure to follow the protocols could

---

[6]     Rule 56(f) provides: "Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

contribute to seizure. He opined that "following proper protocols for weaning and discontinuing medication is the standard of care" and that these protocols "should be general knowledge to a board certified internal medicine physician, but, if not, then [in Marcie's case] there should have been a consult between the internist and the hospital's pharmaceutical department."

The court granted summary judgment to Dr. Footit and the hospital. The court cited AS 09.20.185(a), which lays out the required expert witness qualifications in professional negligence cases. Among the statute's requirements is that the witness be "certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue."[7] The court concluded: "A doctor of pharmacy's expert testimony is insufficient to rebut the testimony of a board-certified internist about the standard of care required of a board-certified internist practicing internal medicine."

The Beistlines moved for reconsideration, arguing again that they had no obligation to produce qualified experts before the pretrial deadline for the exchange of expert reports. They also asserted, however, that they now had an expert witness who was qualified under AS 09.20.185(a), and they asked the court to allow them to submit a supplemental opposition to the summary judgment motion. The court denied reconsideration and entered final judgment for Dr. Footit and the hospital. The Beistlines appeal.

## III. STANDARD OF REVIEW

"We review a grant of summary judgment de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a

---

[7] AS 09.20.185(a)(3).

-7- 7518

matter of law."[8] "We must determine whether any genuine issue of material fact exists, and in so doing all factual inferences must be drawn in favor of — and the facts must be viewed in the light most favorable to — the party against whom summary judgment was granted."[9] "We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[10]

## IV. DISCUSSION

### A. The Sufficiency Of Expert Testimony In A Medical Malpractice Case Depends On Both AS 09.20.185 (Expert Witness Qualifications) And AS 09.55.540 (Burden Of Proof).

The legislature, by statute, has imposed particular requirements for establishing the standard of care in professional negligence cases, including those involving claims of medical malpractice. In any "malpractice action based on the negligence or wilful misconduct of a health care provider," the plaintiff is required to prove "by a preponderance of the evidence" both the standard of care and the defendant's breach of that standard, i.e., "(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or speciality in which the defendant is practicing" and "(2) that the defendant either lacked this degree of knowledge or skill

---

[8]     *Hagen v. Strobel*, 353 P.3d 799, 802 (Alaska 2015) (quoting *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012)).

[9]     *Id.* at 802-03 (quoting *Kelly*, 270 P.3d at 803).

[10]     *Dapo v. State*, 454 P.3d 171, 175 (Alaska 2019) (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

or failed to exercise this degree of care."[11] We have held repeatedly that these elements of the plaintiffs' case require the support of expert testimony except "in non-technical situations where negligence is evident to lay people."[12]

The admissibility of expert testimony is governed by Alaska Evidence Rule 702. The rule provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."[13] But Rule 702(c) notes an exception for professional negligence claims; in those cases "a person may not testify as an expert witness on the issue of the appropriate standard of care except as provided in AS 09.20.185."

That statute, titled "Expert witness qualification," reads in full:

(a)    In an action based on professional negligence, a person may not testify as an expert witness on the issue of the appropriate standard of care unless the witness is

(1) a professional who is licensed in this state or in another state or country;

(2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and

---

[11]    AS 09.55.540(a).

[12]    *Kendall v. State, Div. of Corr.*, 692 P.2d 953, 955 (Alaska 1984); *see also Hagen*, 353 P.3d at 803 (noting that jury may ordinarily find breach of health care provider's duty of care only on basis of expert testimony); *Midgett v. Cook Inlet Pre-Trial Facility*, 53 P.3d 1105, 1115 (Alaska 2002) ("We have held that, where negligence is not evident to lay people, the plaintiff in a medical malpractice action must present expert testimony to establish the claim.").

[13]    Alaska R. Evid. 702(a).

(3) certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue.

(b)     The provisions of (a) of this section do not apply if the state has not recognized a board that has certified the witness in the particular field or matter at issue.

This appeal requires us to again consider the relationship between these two statutes: AS 09.20.185, governing expert qualifications in all professional negligence cases for witnesses testifying about the standards of care, and AS 09.55.540, governing the burden of proof in the more narrow category of "malpractice action[s] based on the negligence or wilful misconduct of a health care provider."

**B.      The Testimony Of An Expert Who Is Qualified Under AS 09.20.185(a) Is Not Necessarily Sufficient To Carry The Plaintiff's Burden Under AS 09.55.540.**

The superior court's summary judgment order is factually premised on its description of Dr. Footit, the defendant physician, as "a board-certified internist practicing internal medicine." The court determined that the defendant in a medical malpractice case is entitled to summary judgment "if the plaintiff fails to present expert testimony from an expert who is board-certified in [the] same field as the physician who committed the alleged malpractice who can establish the standard of care." The court observed that the Beistlines' proposed expert, Dr. Holmquist, was a pharmacist and "not board-certified in the same field of practice as" Dr. Footit; because the Bestlines' claims lacked the support of qualified expert testimony "about the standard of care required of a board-certified internist practicing internal medicine," they could not "survive summary judgment."

We agree with the superior court's conclusion that Dr. Holmquist's expert testimony was not sufficient to carry the Beistlines' burden of proof, though our analysis is different. Because this is a medical malpractice case, we consider the expert witness

qualification requirements of AS 09.20.185 in light of the special burden of proof requirements of AS 09.55.540.[14]

First, Dr. Holmquist appears to meet the requirement of AS 09.20.185(a)(1) because he is "a professional" — a doctor of pharmacy — and "is licensed in . . . another state," Washington.[15] Second, subsection (a)(2) requires that the testifying expert be "trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue." It is undisputed that Dr. Holmquist, as a pharmacist, was not "trained and experienced in the same discipline or school of practice as" Dr. Footit, an internist; this leaves the question of whether he was "trained and experienced . . . in an area directly related to a matter at issue."

As the Beistlines contend, we addressed a similar issue in *Hymes v. DeRamus*, which involved a prisoner's treatment by Department of Corrections medical staff.[16] We held in *Hymes* that the testimony of a rheumatologist was relevant to the standard of care for a prison doctor treating arthritis because he could testify about "the physical effects of abrupt discontinuation of" an arthritis medication.[17] We also considered the affidavit testimony of a psychiatrist, rejecting the argument that she needed to be trained in correctional medicine and observing that she had "sufficient

---

[14]    *See Hymes v. DeRamus*, 222 P.3d 874, 886 (Alaska 2010) (identifying issue of expert witness qualification in medical malpractice case as whether the proposed expert witness could "provide testimony relevant to the standard of AS 09.55.540(a)(1) and [whether] she [met] the requirements of AS 09.20.185(a) as to licensure, training and experience, and certification directly relevant to an area of practice at issue in this case").

[15]    Evidence of Dr. Holmquist's licensure does not appear in our record, but because it is not challenged we assume he meets this criterion of AS 09.20.185(a).

[16]    222 P.3d. at 878, 885-87.

[17]    *Id.* at 886.

training and experience in psychiatry and psychotherapy and related fields to meet the requirements of subsection (a)(2) (training and experience in an area directly related to a matter at issue) to testify regarding the psychological effects of failing to adequately treat [the prisoner's] physical conditions."[18] For both experts, thus, we concluded that their testimony about the physical effects of the alleged malpractice would be relevant to establishing the standard of care.[19] *Hymes* supports the Beistlines' argument that the area in which Dr. Holmquist is "trained and experienced" — i.e., the "proper protocols for weaning and discontinuing medication"—is "directly related to . . . a matter at issue" for purposes of AS 09.20.185(a)(2).

Because of *Hymes*' procedural posture, however, we were not called upon to determine in that case whether the testimony of the plaintiffs' two proposed experts, either singly or in combination, would be *enough* to establish the standard of care. Although the superior court had refused to consider the experts' affidavits, it granted summary judgment on an unrelated ground: the plaintiffs' failure to exhaust their administrative remedies.[20] Reversing the superior court's decision of that issue, we observed that the experts' affidavits would now be relevant on remand when the superior court took a renewed look at the merits.[21]

But relevance does not equal sufficiency. The issue more squarely presented on this appeal is whether a plaintiff can prove the standard of care, as required by AS 09.55.540(a)(1), by the testimony of an expert witness who may satisfy the

---

[18]    *Id.*

[19]    *Id.* at 886-87 & n.45.

[20]    *Id.* at 881-85.

[21]    *Id.* at 885-87.

qualification standards of AS 09.20.185 but otherwise lacks expert perspective on "the field or specialty in which the defendant is practicing."

### C. Dr. Holmquist's Affidavit Was Not Sufficient To Create A Genuine Issue Of Material Fact About An Internist's Standard Of Care.

As noted above, the focus of the superior court's decision was Dr. Holmquist's lack of board certification in a relevant field as required by AS 09.20.185(a)(3); accordingly, that is the focus of the parties' briefing on appeal. The superior court decided that because Dr. Holmquist was "not a board-certified internist," he was "not qualified to offer expert testimony about the standard of care required of the defendant." The Beistlines challenge this decision by arguing that subsection (a)(3) refers only to boards officially recognized by the State of Alaska through its executive branch; that the State has not officially recognized any boards in this way; and therefore, pursuant to AS 09.20.185(b), "[t]he provisions of (a) of this section do not apply," meaning that Dr. Holmquist's expert qualifications are governed only by Evidence Rule 702.

We find it unnecessary to address these arguments. Alaska Statute 09.55.540(a)(1) requires that the plaintiff in a medical malpractice case prove "the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, *by health care providers in the field or specialty in which the defendant is practicing*." (Emphasis added.) Regardless of how we interpret the board-certification requirement of AS 09.20.185(a)(3), Dr. Holmquist's affidavit testimony — the Beistlines' only evidence on the standard of care — was insufficient to create a genuine issue of material fact on that subject.

Dr. Holmquist's affidavit describes his credentials as a Doctor of Pharmacy, a former assistant professor at a university school of pharmacy, and an educator certified by the American Society of Pain Educators and the American Medical Association.

Dr. Holmquist identifies the drugs at issue in this case and the protocols for patient withdrawal, briefly describes Marcie's symptoms upon her admission to the emergency room, and concludes that rather than immediately discontinuing her benzodiazepines and Z-drugs, "Dr. Footit and the hospital staff should have been focused on rapidly raising her sodium levels." Dr. Holmquist's conclusion about the standard of care is this:

> [G]iven the risks of abruptly discontinuing benzodiazepines and Z-drugs in a patient with long-term physical dependence on these medications, following proper protocols for weaning and discontinuing medication is the standard of care. This standard of care should be general knowledge to a board certified internal medicine physician, but, if not, then there should have been a consult between the internist and the hospital's pharmaceutical department.

Dr. Holmquist thus concedes that he does not know whether the withdrawal protocols he describes, known to a pharmacy expert, are also "general knowledge to a board certified internal medicine physician," although he believes that they "should be." And nothing in his affidavit indicates that he has a basis in training or experience for knowing the answer to that question or for knowing the circumstances under which an internist would consider it necessary to consult "the hospital's pharmaceutical department." This is in contrast to the testimony of the defendants' expert, Dr. McIlraith, who testified based on his own training and experience as an internist. According to Dr. McIlraith, Dr. Footit acted appropriately by withdrawing Marcie's medications because she "was on medications that could cause delirium, in prescribed dosages exceeding recommended amounts, and because Dr. Footit could not ascertain how Marcie was taking her medications."

Dr. Footit and the hospital had the initial burden of proving that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law on the issue raised in their summary judgment motion — whether Dr. Footit's

conduct met the governing standard of care.[22] The Beistlines conceded at oral argument on this appeal that the defendants met that burden with the affidavit of Dr. McIlraith. The burden therefore shifted to the Beistlines "to set forth specific facts showing that [they] could produce evidence reasonably tending to dispute or contradict the [defendants'] evidence and thus demonstrate that a material issue of fact exist[ed]."[23] Because Dr. Holmquist's affidavit testimony did not demonstrate a basis on which to challenge Dr. McIlraith on the prevailing standard of care for internists, the superior court was correct to conclude that the Beistlines' claims could not survive summary judgment.[24]

## V.    CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[22]    *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014).

[23]    *Id.* (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

[24]    The Beistlines also argue that summary judgment was premature, either because it was error to grant summary judgment before the parties were required to disclose their experts or because the Beistlines should have been granted more time to produce the expert testimony of an internist. As described above, the superior court granted extensions for the Beistlines' response to the defendants' motion, ultimately totaling 83 days in addition to the initial 15 days allowed by Alaska Civil Rule 77(c)(2)(ii). The court allowed the last two weeks of extension despite a finding that the Beistlines had been dilatory in discovery, citing the "policy in favor of deciding the case on the merits." On this record and the Beistlines' cursory briefing of the issue, we see no abuse of discretion. *See Erica G. v. Taylor Taxi, Inc.*, 357 P.3d 783, 786 (Alaska 2015) ("We apply the abuse of discretion standard when reviewing superior courts' rulings on motions for extension of time.").