*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ADRIENNE TITUS, Personal Representative of the Estate of Joel Titus, | ) ) ) ) | Supreme Court Nos. S-17794/17813 (Consolidated) |
| Appellant, | ) ) | Superior Court No. 4FA-18-02180 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF CORRECTIONS; JOHN DOES 1-6; and GOLDEN HEART EMERGENCY PHYSICIANS, PC, | ) ) ) ) ) ) | No. 7558 – October 8, 2021 |
| Appellees. | ) ) ) | |
| ADRIENNE TITUS, Personal Representative of the Estate of JOEL TITUS, | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) ) | |
| STATE OF ALASKA, DEPARTMENT OF CORRECTIONS, | ) ) ) | |
| Respondent. | ) ) ) | |

Appeal in File No. S-17794 and Petition for Review in File
No. S-17813 from the Superior Court of the State of Alaska,

Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Jeffrey J. Barber, Barber & Associates, LLC, Anchorage, for Appellant/Petitioner. Laura L. Farley, Farley & Graves, P.C., Anchorage, for Appellee Golden Heart Emergency Physicians, PC. Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee/Respondent State of Alaska.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

WINFREE, Justice.

## I.    INTRODUCTION

The personal representative of an estate brought a medical malpractice claim against a company that provided the decedent emergency room medical care shortly before his death. The superior court granted summary judgment dismissing the estate's claim against the company, reasoning that the estate's board-certified expert was not qualified to testify about the relevant standard of care. We reverse the superior court's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Joel Titus was arrested and taken to Fairbanks Correctional Center (FCC) in September 2016. Titus's blood alcohol content upon arrival was .390%. Titus was transported to Fairbanks Memorial Hospital, where an emergency room doctor evaluated him then discharged him to FCC.

Titus had a seizure the next day. He was transported back to the hospital, where another emergency room doctor administered care. The doctor ordered a blood test and gave Titus fluids and medication for alcohol withdrawal syndrome. Titus was

discharged to FCC with follow-up instructions to FCC for treating his alcohol withdrawal symptoms.

FCC staff began administering the care instructed by the emergency room doctor; Titus was housed alone in an observation cell, and staff checked on him "approximately every 30 minutes." Titus was found unresponsive on the cell floor that evening. After FCC staff were unable to revive Titus, he was taken to the hospital and pronounced dead. An autopsy revealed that cardiovascular disease likely caused the death but that "[t]he possibility of an alcohol withdrawal seizure" could not be "completely excluded."

## B.    Proceedings

Adrienne Titus, personal representative of Titus's estate, sued the State of Alaska, Department of Corrections and Golden Heart Emergency Physicians, PC, the company providing emergency room services at the hospital, alleging, among other things, medical malpractice by the Golden Heart doctors. Golden Heart moved for summary judgment, relying on the affidavit of a doctor board certified in emergency and addiction medicine stating that the doctors had not breached the relevant standard of care. The estate opposed summary judgment with Dr. Lisa Lindquist's affidavit stating that the Golden Heart doctors breached the standard of care. The Department did not oppose or otherwise respond to Golden Heart's summary judgment motion.

Dr. Lindquist is not an emergency room doctor or certified in emergency medicine, but according to her affidavits she has experience and training relevant to the underlying facts and circumstances of this malpractice action. She was certified by the American Board of Psychiatry and Neurology; she learned about alcohol withdrawal in medical school; she participated in emergency medicine clinical rotations; she was the current psychiatry department chair at an Anchorage medical center; and she had "experience working in hospital emergency rooms as a physician to provide emergency

room treatment for alcohol withdrawal patients" and as a consultant to emergency room physicians.

Dr. Lindquist stated that all physicians learn basic treatment of alcohol withdrawal:

> All physicians throughout the scope of their medical school education receive specific education on the treatment of alcohol withdrawal. In the scope of medical education this is provided within classroom education and within the scope of clinical rotations within emergency medicine, psychiatry, family medicine and internal medicine. . . .
>
> The standard of treatment of severe alcohol withdrawal is independent of the location or medical specialty wherein the patient first presents to medical care.

Dr. Lindquist also described having experience working alongside emergency room doctors:

> In my current practice . . . I continue to interface directly with physicians and patients within the emergency department. Emergency Medicine physicians are able to consult me for assistance in the management of patients being admitted for the treatment of alcohol withdrawal. . . .
>
> . . . I have experience working in hospital emergency rooms as a physician to provide emergency room treatment for alcohol withdrawal patients. I am knowledgeable about the standard of care specific to providing emergency room medical treatment of alcohol withdrawal patients.

The superior court granted Golden Heart summary judgment. The court explained that because "the events giving rise to this claim concern . . . the decedent's care at [a] hospital emergency room by emergency room physicians, the appropriate standard of care is the degree of care normally exercised by an emergency room physician." The court held that Dr. Lindquist was not qualified to opine on the relevant standard of care because "the issue . . . is the standard of care for an emergency room

physician; a psychiatrist, who is not board[]certified as an emergency room physician, is not qualified to give testimony about the relative standard of care for an emergency room physician." The estate appealed the grant of summary judgment to Golden Heart.

After summary judgment was granted to Golden Heart, The estate sought a motion in limine prohibiting the Department from introducing any evidence "blaming, inferring, or implying that . . . Golden Heart . . . did anything improper." The estate argued that the Department was estopped from asserting Golden Heart's negligence because the Department had failed to oppose summary judgment and it would be "manifestly unfair . . . to allow [the Department] to blame the empty chair . . . to avoid liability." The Department responded that it was permitted to seek fault allocation to Golden Heart under Alaska's statutory comparative fault framework. The superior court denied the estate's motion in limine, and the estate petitioned for review of the court's order. We granted the petition for review and consolidated the matters.

## III.    DISCUSSION

This appeal's resolution turns on the superior court's summary judgment decision. We review grants of summary judgment de novo and draw all factual inferences in favor of the nonmoving party.[1] A superior court's decision whether to admit or exclude expert testimony generally is reviewed for abuse of discretion, but evidentiary conclusions turning on questions of law are reviewed de novo.[2]

In a medical malpractice action a defendant can make an initial showing that an element of the plaintiff's prima facie case is unsatisfied by submitting an expert

---

[1]     *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005).

[2]     *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1192 (Alaska 2009).

affidavit stating the defendant's conduct complied with the relevant standard of care.[3] Once this initial showing is made, the burden shifts to the plaintiff to show summary judgment is not appropriate by producing expert testimony creating a dispute of material fact about whether defendant's actions fell below the applicable standard of care.[4] Evidence proffered at the summary judgment stage must be admissible.[5] It is insufficient to show a dispute of fact about an expert's qualification; the party must affirmatively show that the expert is qualified.[6] If affidavit testimony is insufficient to resolve any factual disputes related to expert qualification, a court may hold a preliminary hearing on the issue of expert qualification before deciding the summary judgment motion.[7]

---

[3]     *See Kendall v. State, Div. of Corr.*, 692 P.2d 953, 955 (Alaska 1984).

[4]     *See id.*; *Greywolf v. Carroll*, 151 P.3d 1234, 1241 (Alaska 2007).

[5]     *Greywolf*, 151 P.3d at 1241.

[6]     *See* Alaska R. Evid. 104 (describing witness qualification as preliminary question of admissibility); 31A AM.JUR.2D *Expert and Opinion Evidence* § 42 (2002) ("[Q]ualification of a witness as an expert is a preliminary question for the trial court to decide before receiving or admitting the witness's testimony." (footnote omitted)).

[7]     *Cf. Cikan v. ARCO Alaska, Inc.*, 125 P.3d 335, 339 (Alaska 2005) (noting court must resolve statute of limitations factual disputes in preliminary hearing); *see also* Alaska R. Evid. 101(c)(1) (stating rules of evidence do not apply to "determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the judge under Rule 104(a)").

## A. Statutory Interpretation[8]

Two statutes are particularly relevant to reviewing whether the superior court correctly concluded that Dr. Lindquist was not qualified to provide the necessary expert witness testimony to oppose Golden Heart's summary judgment motion. The plaintiff in a medical malpractice claim is required to prove the standard of care applicable to the defendant, among other things, under AS 09.55.540(a):

> In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence
>
> > (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing.

Experts qualified to testify about the relevant standard of care in a professional malpractice action are limited by AS 09.20.185(a):

> In an action based on professional negligence, a person may not testify as an expert witness on the issue of the appropriate

---

[8] We use a sliding scale approach when interpreting statutes: "[T]he plainer the language of the statute, the more convincing contrary legislative history must be." *In re Nora D.*, 485 P.3d 1058, 1064 (Alaska 2021) (alteration original). We generally give effect to all of a statute's "provisions, so that no part will be inoperative or superfluous, void or insignificant." *Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1045 (Alaska 1992) (quoting *Alascom, Inc. v. N. Slope Borough, Bd. of Equalization*, 659 P.2d 1175, 1178 n.5 (Alaska 1983)). And we generally presume that the legislature intended to refer to two different concepts when it used two different terms in a statute. *Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 182 (Alaska 2019) ("Principles of statutory construction mandate that we assume the legislature meant to differentiate between two concepts when it used two different terms.").

standard of care unless the witness is

> (1) a professional who is licensed in this state or in another state or country;

> (2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and

> (3) certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue.[9]

When AS 09.20.185 was considered by the House Judiciary Committee, legislators discussed the proposed bill's effect, including concerns about limiting the number of experts available to testify in professional negligence cases. One representative mentioned the difficulty of getting experts to testify in rural Alaska.[10] Another mentioned the problem of experts within the same field being hesitant to testify against one another.[11] Addressing these concerns, a bill sponsor explained that the bill required only that an expert "be in the ballpark of the qualifications of that professional trained in the same basic disciplines."[12] The sponsor further explained that the bill requires that "if a professional is going to be judged, then a professional of at least

---

[9]    The legislature enacted AS 09.20.185 in 1997, approximately 30 years after AS 09.55.540 first required plaintiffs to prove the standard of care in a medical malpractice action. *See* ch. 26, § 15, SLA 1997; ch. 49, § 1, SLA 1967.

[10]    Minutes, H. Jud. Standing Comm. Hearing on H.B. 58, 20th Leg., 1st Sess. Tape 97-28, Side A, No. 2370 (Feb. 26, 1997) (statement of Rep. Ethan Berkowitz).

[11]    *Id.* at Side B, No. 0090 (statement of Rep. Eric Croft).

[12]    *Id.* at Side B, No. 0000 (statement of Bill Sponsor Rep. Brian Porter).

someone in the same general area knowledge and background" should testify about the standard of care.[13]

We first recognized the relationship between AS 09.20.185 and AS 09.55.540 in *Hymes v. DeRamus*, describing the issue of expert witness qualification in a medical malpractice case as whether the proposed expert could "provide testimony relevant to the standard of AS 09.55.540(a)(1) and [whether the proposed expert met] the requirements of AS 09.20.185(a) as to licensure, training and experience, and certification directly relevant to an area of practice at issue in this case."[14] And we most recently explained it in *Beistline v. Footit*, titling a section: "The Sufficiency Of Expert Testimony In A Medical Malpractice Case Depends On Both AS 09.20.185 (Expert Witness Qualifications) And AS 09.55.540 (Burden Of Proof)."[15]

Dr. Lindquist meets the requirements of AS 09.20.185(a)(1) as a licensed Alaska physician. Dr. Lindquist qualifies under AS 09.20.185(a)(2)-(3) if she is "trained and experienced" in "an area directly related to a matter at issue" and "certified by a board recognized by the state as having acknowledged expertise and training directly related to the . . . matter at issue." The parties dispute the meaning of "matter at issue" in this case. The estate asserts that the matter at issue is "medical treatment for alcohol withdrawal provided at a hospital emergency room" and contends that "Dr. Lindquist is highly qualified in the area of alcohol withdrawal treatment and severe alcohol withdrawal treatment." Golden Heart responds that because "Golden Heart is comprised of emergency medicine physicians, and because the field or matter at issue in this case

---

[13]    *Id.* at No. 0341 (statement of Bill Sponsor Rep. Brian Porter).

[14]    222 P.3d 874, 886 (Alaska 2010).

[15]    485 P.3d 39, 43 (Alaska 2021).

is emergency medical care performed by an emergency room physician at a hospital emergency department, the [e]state was required to present expert testimony from a board-certified emergency medicine physician."

Dr. Lindquist clearly was not certified in the same field as the defendants, but the superior court did not address whether Dr. Lindquist's certification was "directly related to the . . . matter at issue."[16] The court effectively held, as a matter of law, that only a board-certified emergency room doctor could satisfy AS 09.20.185(a)(3)'s requirement that the witness be "certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue." This conclusion assumes that "field" and "matter at issue" refer to the same concept. Although we have not precisely defined what "matter at issue" means in this statute, we presume the legislature did not intend it to mean the same thing as "field,"[17] and the relevant legislative history does not persuasively indicate otherwise.[18]

We hold that "matter at issue"[19] in the medical malpractice context refers to the underlying circumstances of the medical event or treatment giving rise to the medical malpractice action. Whether an expert's training, expertise, or certification is "directly related" therefore varies depending on the facts and circumstances of the alleged malpractice. This flexible standard is appropriate because the qualification

---

[16] *See* AS 09.20.185(a)(3).

[17] *Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 182 (Alaska 2019) ("Principles of statutory construction mandate that we assume the legislature meant to differentiate between two concepts when it used two different terms.").

[18] *See supra* notes 10-13 and accompanying text.

[19] AS 09.20.185(a)(3).

statute addresses medical malpractice scenarios ranging from very simple to very specialized matters. It recognizes that physicians with different qualifications than the defendant may, given the specific facts and circumstances of the case, nonetheless have knowledge about the standard of care in the defendant's field.

For example, a plaintiff who alleges an emergency room doctor was negligent in suturing a wound may be able to survive summary judgment using the testimony of a board-certified pediatrician who attests that pediatricians regularly suture wounds, that the proper procedure for sutures is taught to all physicians in medical school (and therefore the standard is the same for all physicians), and that the sutures were improperly done.[20] On the other hand, a plaintiff alleging a neurosuregon negligently performed specialized brain surgery may need the testimony of a board-certified neurosurgeon because no other fields of medicine are directly related to the matter at issue. These examples illustrate that whether a proposed expert's expertise, training, and certification are directly related to a matter at issue will depend on a variety of factors that trial courts should consider. Considerations include: underlying medical conditions; the medical care or treatment provided (or not provided); the clinical setting; whether the medical condition or treatment is general knowledge to all or most physicians or a specialized procedure limited to a smaller set of physicians; the extent to which the medical care provided involved assessment and treatment of multiple issues

---

[20]     *See Hall v. Frankel*, 190 P.3d 852, 858 (Colo. App. 2008) ("[The court's] understanding is that when we look at these specialties, it's like the branching of a tree. There are certain things that [all specialty medical fields] have in common. There are certain basic medical notions that people know regardless of where they branched to. And if this is something that they all know, . . . people who are in other specialties [can] testify as long as the nature of their testimony is [']you need to know that because you're a doctor.['] " (quoting trial court's oral explanation of medical expert qualification)).

simultaneously; and whether there otherwise is a foundation for the expert's opinion about the standard of care for providers in the defendant's field.

This flexible interpretation of "matter at issue" is consistent with the relevant legislative history of AS 09.20.185. A bill sponsor stated that experts need only "be in the ballpark of the qualifications of that professional" who allegedly committed malpractice and that the expert should have the "same general area knowledge and background."[21] And this interpretation is consistent with AS 09.55.540, which provides that a medical malpractice plaintiff must prove "the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing." Finally, this interpretation is consistent with *Beistline*'s instruction that "[t]he sufficiency of expert testimony in a medical malpractice case depends on both AS 09.20.185 . . . and AS 09.55.540," without reading "matter at issue" out of AS 09.20.185.[22]

*Beistline* is instructive. Beistline sought medical attention at an emergency room for "generalized weakness, ataxia[,] . . . confusion," and other symptoms.[23] Beistline was taking a variety of prescription medications "per her own regimen."[24] Dr. Footit, a board-certified internist treating Beistline, "found it difficult to diagnose the

---

[21]  Minutes, H. Jud. Standing Comm. Hearing on H.B. 58, 20th Leg., 1st Sess. Tape 97-28, Side B, Nos. 0000, 0341 (Feb. 26, 1997) (statement of Bill Sponsor Rep. Brian Porter).

[22]  485 P.3d 39, 43 (Alaska 2021).

[23]  *Id.* at 40.

[24]  *Id.*

causes of her problems."[25] Dr. Footit ordered a hold on her medications and planned several procedures to correct her sodium levels.[26] Beistline experienced a seizure a few days later.[27] She sued Dr. Footit and the hospital, alleging that the seizure was the result of his decision to take her off of her prescription medications and that this decision fell below the applicable standard of care.[28]

Dr. Footit moved for summary judgment, supported by an affidavit from a licensed and board-certified internal medicine physician.[29] Dr. Footit's expert attested that Dr. Footit met the applicable standard of care and "acted as a reasonable and prudent internist."[30] Beistline responded with a pharmacist's affidavit.[31] The pharmacist attested that following proper weaning protocols for Beistline's medications was the standard of care and that "these protocols 'should be general knowledge to a board[-]certified internal medicine physician, but, if not, then . . . there should have been a consult between the internist and the hospital's pharmaceutical department.' "[32] The superior court granted summary judgment to Dr. Footit, concluding that "[a] doctor of pharmacy's expert testimony is insufficient to rebut the testimony of a board-certified internist about

---

[25] *Id.* at 40-41.

[26] *Id.* at 41.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 42.

[32] *Id.*

the standard of care required of a board-certified internist practicing internal medicine."[33]
Beistline appealed.

On review we noted that the proffered expert pharmacist may have been trained and experienced in an area " 'directly related to . . . a matter at issue' for purposes of AS 09.20.185(a)(2),"[34] but we upheld the superior court's grant of summary judgment because the pharmacist's "affidavit testimony . . . was insufficient to create a genuine issue of material fact on that subject."[35] The pharmacist expressly "concede[d] that he does not know whether the withdrawal protocols he describe[d], known to a pharmacy expert, are also 'general knowledge to a board[-]certified internal medicine physician,' " and summary judgment was therefore proper.[36] Importantly we did not accept the superior court's conclusion that a defendant in a medical malpractice case is entitled to summary judgment "if the plaintiff fails to present expert testimony from an expert who is board[]certified in [the] same field as the physician who committed the alleged malpractice who can establish the standard of care."[37]

Although we provided some guidance about the proper interpretation of AS 09.20.185 in relation to AS 09.55.540, *Beistline*'s core holding was that the pharmacist's affidavit was insufficient to create a genuine issue of material fact about the proper standard of care for "health care providers in the field or speciality in which the defendant [was] practicing" — because the affidavit expressly disclaimed such

---

[33]    *Id.*

[34]    *Id.* at 44.

[35]    *Id.* at 45-46.

[36]    *Id.* at 45.

[37]    *Id.* at 43.

knowledge — "[r]egardless of how we interpret[ed] the board-certification requirement of AS 09.20.185(a)(3)."[38]  And a review of our older case law indicates we have implicitly understood "matter at issue" to include consideration of the underlying medical conditions or treatment giving rise to the malpractice claim.[39]

### B.    Whether Dr. Lindquist Is Qualified

In light of our statutory interpretation, it was error to not qualify Dr. Lindquist as an expert in this case simply because she is not board certified in emergency medicine.  Dr. Lindquist — a licensed physician under AS 09.20.185(a)(1) — explained that alcohol withdrawal procedures are general knowledge to all physicians because the standardized treatment is taught in medical school.  Dr. Lindquist meets the requirement of AS 09.20.185(a)(3) because a variety of fields of medicine (including psychiatry, for which Dr. Lindquist is board certified) directly relate to the matter at issue.  And Dr. Lindquist's attestation that she was "train[ed] on the management of alcohol withdrawal, . . . includ[ing] the management of severe alcohol withdrawal symptoms," in medical school and that she has "experience working in hospital emergency rooms as a physician to provide emergency room treatment for alcohol withdrawal patients," satisfies AS 09.20.185(a)(2)'s requirement.  Dr. Lindquist

---

[38]    *Id.* at 45.

[39]    *See Hymes v. DeRamus*, 222 P.3d 874, 878-79, 885-87 (Alaska 2010) (holding rheumatologist was qualified to testify about standard of care applicable to correctional medical providers treating inmate's arthritis and psychiatrist could be qualified to testify about connection between depression and hypothyroidism, two conditions the plaintiff allegedly experienced, if board certified in psychiatry); *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1189, 1192 (Alaska 2009) (holding that former Alaska Board of Nursing member was qualified to testify about standard of care applicable to certified nursing assistants because she worked as nurse for many decades and served on board regulating certified nursing assistants).

therefore is qualified under AS 09.20.185 to give expert testimony about the standard of care applicable to "health care providers in the field . . . in which [the Golden Heart doctors were] practicing."[40]

Whether the doctors treating Titus complied with the standard of care thus is in dispute, and it was error to grant summary judgment to Golden Heart. Because it was error to grant summary judgment to Golden Heart, the superior court's later order regarding allocation of fault to Golden Heart is moot. We therefore do not reach the issue raised in the petition for review.

## IV.    CONCLUSION

The superior court's decision is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

---

[40]     *See* AS 09.55.540(a)(1).