*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| NIXOLA JEAN DOAN, Personal Representative of the Estate of TRISTANA LAURENE DOAN, and NIXOLA JEAN DOAN, Individually, | ) ) ) ) ) | Supreme Court No. S-17891<br><br>Superior Court No. 4FA-13-01538 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7663 – June 30, 2023 |
| BANNER HEALTH INC., d/b/a FAIRBANKS MEMORIAL HOSPITAL; NORTHERN HOSPITAL ASSOCIATION, LLC; JAMES W. CAGLE, D.O.; GOLDEN HEART EMERGENCY PHYSICIANS; and FAYE LEE, M.D., | ) ) ) ) ) ) ) ) ) | |
| Appellees. | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Brent E. Bennett, Douglas Blankenship, and Raymond Funk, Judges.

Appearances: Mike A. Stepovich, Fairbanks, for Appellants. Howard A. Lazar and Whitney L. Wilkson, Delaney Wiles, Inc., Anchorage, for Appellee Banner Health, Inc., d/b/a Fairbanks Memorial Hospital. John J. Tiemessen, Clapp Peterson Tiemessen Thorsness & Johnson, LLC, Anchorage, for Appellees Northern Hospital Association, James W. Cagle, D.O., Golden Heart Emergency Physicians, and Faye Lee, M.D.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A young woman died of heart failure while hospitalized. Her mother, acting on her own behalf and as personal representative of the woman's estate, sued the hospital, several doctors, and the doctors' employers for medical malpractice. In successive orders the superior court decided that all the witnesses proposed by the mother as medical experts failed to meet the statutory requirements for expert testimony on the relevant standards of care. The court also denied the mother's motion to replace the rejected expert witnesses; granted summary judgment in favor of the defendants on the mother's claim for damages for a lost chance of survival, deciding that such a claim was contrary to Alaska's medical malpractice statutes; and — rejecting the mother's request to file an amended complaint — found that the amended complaint sought to impermissibly allege a new claim for negligent infliction of emotional distress against the doctors. The mother appeals.

We conclude that exclusion of the mother's proposed expert witnesses rested on a misinterpretation of the statutes that govern standard of care testimony, and we therefore reverse the exclusion orders so that the court can reconsider the witnesses' qualifications within the proper statutory framework. We conclude that the superior court did not abuse its discretion by denying the mother's tardy request to replace one of her expert witnesses, who had lost the necessary board certification years earlier. We also affirm the superior court's grant of summary judgment on the loss of chance claim, concluding, as the superior court did, that whether to recognize such a claim is a policy choice for the legislature to make.

Finally, we conclude that under Alaska's generous notice pleading rules, the mother adequately alleged a claim for negligent infliction of emotional distress

against the doctors, and it was not necessary for her to amend her complaint in order to pursue such a claim.  We remand the case to the superior court for further proceedings.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

In late February 2011 Tristana Doan suffered a seizure several hours after receiving her regular maintenance dose of methadone.[1]  She was transported by ambulance to Fairbanks Memorial Hospital, where Dr. Faye Lee treated her in the emergency department before discharging her about four hours later.

The next morning Tristana was again given her usual dose of methadone. Just over an hour later she returned to the hospital, complaining of shortness of breath. She was again seen by Dr. Lee, who found an erratic heart rate and low blood-oxygen saturation.  Dr. Lee ordered an EKG, an X-ray, and a CT angiogram and placed Tristana on supplemental oxygen, medication for nausea and coughing, and saline for hydration. Dr. Lee then referred Tristana to Dr. James Cagle, who worked as a hospitalist and intensivist in the hospital's intensive care unit (ICU).[2]

In the ICU Tristana's condition continued to worsen.  Dr. Cagle tried a number of interventions and medications, including benzodiazepines, throughout the day. But Tristana's heart rate plummeted, and, notwithstanding multiple rounds of CPR and electric shock, she died late that evening.

### B.  Proceedings

In February 2013 Tristana's mother, Nixola Doan, individually and as personal representative of Tristana's estate, filed a complaint against the hospital's

---

[1]  Methadone is a "synthetic narcotic drug" and is "used during withdrawal treatment in morphine and heroin addiction."  *Methadone Hydrochloride*, STEDMANS MEDICAL DICTIONARY (28th ed. 2006).

[2]  A hospitalist is "[a] physician whose professional activities are performed chiefly within a hospital."  *Hospitalist*, STEDMANS MEDICAL DICTIONARY (28th ed. 2006).  An intensivist is an "intensive care specialist."  *Id.*

operator, Banner Health, Inc.; Dr. Cagle and his employer, Northern Hospital Associates; and Dr. Lee and her employer, Golden Heart Emergency Physicians.[3] Doan's second amended complaint, filed in 2015, alleged medical malpractice by Dr. Lee, Dr. Cagle, and Banner Health, wrongful death by Dr. Cagle and Banner Health, negligent infliction of emotional distress (NIED) "by the Defendants," reckless administration of drugs by the hospital's pharmacy department, and negligent credentialing of Dr. Lee and Dr. Cagle by Banner Health.[4] Two of the complaint's counts alleged that the defendants' negligence caused Tristana to lose "the chance of survival."

### 1. Expert witness proceedings

#### a. The experts

Doan identified nine retained experts by September 2015, five of whom are relevant to this appeal: Gregory Holmquist, Ph.D., a pharmacist; John Olsen, M.D., and Mori Krantz, M.D., both cardiologists; Michael Schiesser, M.D., a doctor of internal medicine and addiction medicine; and Paul Bronston, M.D., an emergency room physician.

Holmquist had a pharmacy license and worked for over 20 years at a Seattle hospital "as a hospitalist-pharmacist that specialized in oncology medicine." In this role he responded to emergency room calls "asking for advice regarding everything from treatment of infections to correct dosing of different medicines to just a variety of different . . . pharmacological decisions they were making." But he did not go to medical school or work as an emergency physician, and his only board certification, in

---

[3] Unless the context requires otherwise, we generally refer to Dr. Lee and her employer collectively as "Dr. Lee" and to Dr. Cagle and his employer collectively as "Dr. Cagle."

[4] Both complaints also included allegations against two other defendants who later settled. *See Doan v. Banner Health*, 485 P.3d 537, 539 (Alaska 2021).

oncology pharmacy, expired in 2006. At his deposition he testified that when he heard the case involved "a young woman who had died related with a methadone thing," he was "curious why [he] would be an expert."

Dr. Olsen was a "highly trained and experienced cardiologist." He was not an emergency medicine physician, though he testified that he "moonlight[ed] as an emergency room physician and also was assigned [emergency medicine] as a medicine resident" at two hospitals in the 1980s. He was certified by the National Board of Medical Examiners and the American Board of Internal Medicine (including its cardiovascular disease certification), but he had never been board certified in emergency medicine. At the time of his deposition he was teaching internal medicine at the University of Washington medical school. When asked if he had ever worked as an intensivist or a hospitalist, he responded, "Thank God, no."

In his expert report Dr. Olsen wrote that "[s]everal aspects of Ms. Doan's care [we]re below the standard of care required of a reasonable and prudent physician caring for a patient with her problems." He identified several actions taken by Dr. Lee that he believed fell below the standard of care; at his deposition, however, he testified, "I'm not a board certified emergency medicine physician; so no, I won't be testifying as to the standard of care." When asked about Dr. Cagle's performance and whether "there was a failure to recognize congestive heart failure and then treat it and if . . . there had been that recognition of treatment, it's possible the patient may have survived," Dr. Olsen answered that such a characterization would be fair.

Dr. Schiesser had been board certified in both internal medicine and addiction medicine, though his internal medicine certification had lapsed by 2019. He had not worked in an emergency room since at least 2000 and had not managed a patient in the ICU since his residency in the late 1990s. But Dr. Schiesser was unclear as to

whether he would testify that Dr. Cagle's actions fell below the standard of care.[5]  At his deposition, Dr. Schiesser opined that Dr. Cagle's actions fell below the standard of care "[w]hen he prescribed Xopenex to the patient when the patient had just received the maximum dose of Xopenex for the eight-hour period."[6]  He also opined that "[a] reasonable physician . . . would understand that adding the [benzodiazepines] will accelerate the respiratory collapse[, and a] reasonable and prudent physician would work to establish an airway much sooner, and avoid the benzo/methadone combination, understanding [the patient] is unlikely to be able to breathe on her own when exposed to that."

Dr. Schiesser also said he would testify that Dr. Lee's actions fell below the standard of care, but he then testified he would defer on that issue to experts who were board certified in emergency and critical care medicine.  He acknowledged that he would normally turn down a request to opine on the standard of care for emergency physicians, "because there's other people more qualified than me to . . . sift through the data.  This case . . . took me a long time to . . . review and understand what I was looking at . . . to the point where I could actually have an opinion."

Dr. Bronston was once board certified in emergency medicine, but his board certification lapsed on December 31, 2015.

Dr. Krantz was "a board certified [c]ardiologist" who "worked as an Emergency Room (ER) and urgent care physician for two years."  In 2015, when he

---

[5]        Dr. Schiesser stated at one point that he was "comfortable challenging the care that [Dr. Cagle] provided as being below the standard of care,"  though he had said earlier that he did not think he was qualified to do so.

[6]        *See* National Library of Medicine, *Label: Xopenex*, DAILYMED, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=7e2644e6-36c5-4988-8e52-bec90e2cd2f0 (Sept. 14, 2022) (noting Xopenex is used for the "[t]reatment or prevention of bronchospasm in adults . . . with reversible obstructive airway disease"); *see also Bronchial Asthma*, STEDMANS MEDICAL DICTIONARY (28th ed. 2006) (listing the generic form of Xopenex as a treatment for "chronic or severe asthma").

submitted his expert report, he was "see[ing] patients regularly in the medical intensive care unit and outpatient setting" and "work[ing] closely with internal medicine physicians, hospitalists, intensivists, and [opioid treatment program] staff." He explained, "I have extensive experience treating patients with life-threatening arrhythmias, in particular those associated with oral methadone. I also have particular experience caring for patients with acute heart failure and stress cardiomyopathy."

At his deposition Dr. Krantz disclaimed any intent to testify about the standard of care required of Dr. Lee when deciding whether to admit Tristana to the hospital; he testified, "I'm not going to tell an ER doctor whether she should or shouldn't have been admitted." But he opined that Dr. Lee's treatment of Tristana on her second hospital visit fell below the standard of care, though cautioning that using "the benefit of hindsight . . . [was] a little bit unfair to Dr. Lee." In Dr. Cagle's case, Dr. Krantz explained that the issues involved should be known to all physicians. He added: "[Y]ou probably wouldn't even need a pulmonologist or a cardiologist to help you sort through the case."

### b. Defense challenges to the experts

Banner Health moved to preclude the testimony of Holmquist, Dr. Olsen, and Dr. Schiesser on the issue of emergency physicians' standard of care. It argued that none of these three proposed experts had "sufficient knowledge of emergency medicine as contemplated by [AS 09.20.185[7]] to be permitted to provide their opinions on the question." Banner Health pointed out that Holmquist had "never worked as a physician of any type," that Dr. Olsen's testimony relied on "a number of articles and textbooks" that "may be unknown to the average emergency physician," and that Dr. Schiesser

---

[7] The statute mandates the qualifications for "an expert witness on the issue of the appropriate standard of care" in a professional negligence case, including professional licensure, training and experience in the defendant's discipline or a directly related area, and board certification.

knew too much about methadone to testify fairly about the standard of care applicable to defendants who were not addiction specialists like himself. Dr. Cagle joined in Banner Health's motion.

In her opposition, Doan cited AS 09.20.185(b), which states that the statute's expert witness licensing requirements "do not apply if the state has not recognized a board that has certified the witness in the particular field or matter at issue." She argued that because the State of Alaska has not recognized a medical board, the requirement of (a)(3) that requires board certification could not apply.

The superior court rejected Doan's interpretation of the law and granted the motion to preclude the testimony of all three experts, finding that they were "not qualified to testify about the standard of care for emergency room physicians." Though the court did not explicitly state that an expert must be board certified in the same specialty as the defendant, it did note Doan's failure to "assert that the experts are board[ ]certified in the relevant practice area, emergency room practice and procedure," and the defendants' reliance on the experts' lack of certification "in the area of emergency room practice."

Doan moved for reconsideration, arguing that the court's interpretation of AS 09.20.185 mistakenly "precluded experts from testifying as to the 'matters at issue,' only because they are not board certified in the same 'field of practice.' " Citing *Hymes v. DeRamus*, she argued that "an expert need not be board certified in the same 'field' of practice as the defendant doctor to testify as to the standard of care or breach thereof if the witness is trained and certified as to the 'matter at issue.' "[8] The court denied reconsideration.

Banner Health next moved for summary judgment on Doan's claim against the hospital's pharmacy department. It argued that because Holmquist's board

---

[8]     222 P.3d 874 (Alaska 2010).

certification had lapsed in 2006, he was unqualified under AS 09.20.185(a)(3) to testify about a pharmacist's standard of care. Doan had not listed any other pharmacist experts, and therefore, Banner Health argued, the claim against the pharmacy department had to be dismissed as unsupportable.

The superior court granted the motion provisionally, giving Doan some time to see whether Holmquist would renew his board certification. When that did not occur, Banner Health renewed its motion. Doan filed an opposition, arguing again that the court's prior orders erred in their interpretation of the expert witness requirements. But the court granted Banner Health's motion in August 2017, precluding Holmquist's testimony and dismissing Doan's claim against the pharmacy department. Over a year later, Doan moved to substitute a new expert for Holmquist, but the court denied the motion.

In July 2019 Doan filed a motion in limine seeking an order allowing Dr. Krantz to testify about the applicable standards of care. Doan argued that an expert witness need only be "certified and trained as to the matter at issue" rather than have the same specialty board certification as the defendant doctors. She asserted that Dr. Krantz's "training and work as an intensive care doctor . . . along with professional credentials . . . together with his board certification in internal medicine electrocardiology qualify him to testify as to the matters at issue in this case."

Banner Health characterized Doan's motion as simply rehashing her already rejected interpretation of the expert witness qualification statutes. Banner Health argued that the court had "plainly held (and reiterated several times) that in order for an expert to testify about the standard of care, the expert must be Board Certified in the area in which the defendant physician is practicing." It asserted that "[u]nder the Court's prior orders, Dr. Krantz is not qualified to testify to the standard of care for an Emergency Room physician because Dr. Krantz is Board Certified in cardiology only, not Emergency Room medicine (or any other field)."

The superior court denied Doan's motion in limine, explaining, "AS 09.55.540(a) provides that [Doan] must prove [malpractice] by qualified expert testimony in 'the field in which the defendant doctor is practicing.' Dr. Krantz is not so qualified and thus cannot be allowed to testify as to the standard of care in those specialties as those defendants." In the court's view, Doan was required to "offer expert testimony in the same special[t]y as board certified physician defendants and not other medical specialties." The court concluded, "While Dr. Krantz may meet the general requirements of AS 09.20.185," he "does not meet the specific requirements of AS 09.55.540 because Dr. Krantz is not board certified in the same field(s) as Dr. Cagle and/or Dr. Lee and therefore will not be allowed to give an opinion as to their actions."

In January 2020 Dr. Cagle and Dr. Lee moved to bar Dr. Bronston's testimony on the ground that he was no longer board certified in any specialty. The court granted the doctors' motion. Doan then moved to replace Dr. Bronston, Dr. Olsen, and Dr. Krantz with experts she asserted were "qualified under the interpretation of AS 09.20.185 as previously established in this case." She moved to replace Dr. Bronston with Dr. Richard Cummins, who was board certified in emergency medicine, and to replace Dr. Olsen and Dr. Krantz with Dr. Curtis Veal, who was board certified in critical care medicine. Dr. Cagle and Dr. Lee opposed Doan's motion on the grounds that the deadline for expert disclosures had long since passed, that adding new experts would delay trial, and that Doan had been aware of her original experts' lack of qualification for years.

The superior court denied Doan's motion to substitute new experts, explaining, "Having board certified experts in the same specialty as the defendants has been a central issue in this case for several years and the court's rulings have been consistent on that question." The court "agree[d] with the [doctors'] assertion that [Doan] had an obligation to remain apprised of her experts' eligibility to testify, and to promptly inform the [doctors] and the court if any of her experts became ineligible to

testify; [Doan] failed to do so in a timely fashion." The court concluded that Doan's motion was "untimely and the prejudice to [the doctors] severe if granted."

### 2. Loss of chance proceedings

In February 2015 Banner Health moved for summary judgment on Doan's loss of chance claim on the ground that the "advancement of the loss of chance doctrine is an attempt to abrogate the[] duty to meet the traditional causation standards and the legislatively mandated burden of proof requirements set forth in AS 09.55.540." Dr. Cagle and Dr. Lee joined in Banner Health's motion. In opposition Doan argued that the Alaska Supreme Court would "likely . . . follow the majority of states, which have adopted the loss of chance doctrine."

The superior court granted summary judgment on the claim, deciding that to recognize it would be "contrary [to] the comprehensive scheme for claim[s] made against health care providers in Alaska." Ultimately, the court concluded, "the decision to add a cause of action for a loss of chance for recovery against a health care provider should be determined by the legislature."

### 3. NIED proceedings

In Doan's second amended complaint she generally followed a formula of naming each claim and identifying the parties against whom it was alleged. For the NIED claim, however, instead of listing specific defendants in the claim's title as she did for every other claim (for example, "Medical Malpractice as to [Fairbanks Memorial Hospital (FMH)], [Golden Heart Emergency Physicians (GHEP)], and Dr. Lee"), she titled the claim "Negligent Infliction of Emotional Distress by the Defendants." In the two-sentence description of the claim that followed, she named only the hospital, asserting that her emotional distress was caused by "[t]he negligent acts of defendant FMH."

In November 2019 the superior court held a status hearing to clarify which claims were asserted against which parties. The court began the hearing by noting, "I'm not going to . . . make any rulings. I'm going to give parties plenty of time to help me

understand stuff." The court then expressed its view that the NIED claim was "only brought against the hospital. It's not brought against the doctors." Acknowledging that Dr. Cagle and Dr. Lee had nonetheless "been filing pleadings for a long time" related to the NIED claim, it observed that the doctors were not being "sued for causing any negligent infliction of emotional distress, it appears to the Court," reiterating this viewpoint several more times during the hearing. Though Doan and three of her attorneys were present, no one objected to the court's description of the NIED claim. Toward the end of the hearing, the court asked for pretrial memoranda explaining the parties' positions on various issues.

Doan filed her pretrial memorandum in December 2019, stating that she would move to file a third amended complaint that "w[ould] reflect the remaining claims and their renumbering with a brief explanation of which claims are dismissed." She then listed her NIED claim as being against "FMH, Dr. Cagle, and Dr. Lee." When she filed her proposed amended complaint, the NIED claim was accordingly entitled "Negligent Infliction of Emotional Distress by the Defendants FMH, Dr. Cagle, and Dr. Lee," and it alleged that "[t]he negligent acts of defendants FMH, Dr. Cagle, and Dr. Lee on March 1, 2011[] caus[ed] the death of TRISTA[] [and] subjected NIXIE to extreme emotional distress."

Dr. Cagle and Dr. Lee opposed Doan's motion for leave to file the amended complaint in part because it added "new NIED claims against [them.]" Doan replied that they "knew that the [NIED] claim was brought against both Dr. Cagle and Dr. Lee" and therefore there was "no prejudice to amend the complaint to conform to the evidence."

The court denied the motion to amend the complaint. It found that "at no time . . . did [Doan] sue [the doctors] for [NIED]. Until the newest proposed amendment, it was only the hospital itself who was sued for this claim." The court "conclude[d] that the plain language of the [second amended] complaint does not raise the additional claims that the Plaintiff wished to bring through amendment."

### 4. Grant of summary judgment in favor of the doctors and Banner Health

At the same time that they moved to exclude Dr. Bronston as a testifying expert, Dr. Cagle and Dr. Lee moved for summary judgment on all remaining claims against them, contending that Doan was now completely without any of the expert testimony ordinarily required in a medical malpractice case.[9] The superior court granted the motion. Describing Dr. Cagle's and Dr. Lee's board certifications and fields of practice, the court concluded that Doan had no witnesses who could "satisfy the statutory requirements for providing testimony concerning [the doctors'] malpractice . . . — all of [Doan's] experts previously proffered for this purpose have been disqualified by this court on substantive or procedural grounds." The court entered final judgment in favor of the doctors and Banner Health.

Doan appeals.

## III. STANDARD OF REVIEW

"We review grants of summary judgment de novo and draw all factual inferences in favor of the nonmoving party."[10] We generally review for abuse of discretion a superior court's decision to admit or exclude expert testimony.[11] But we review "evidentiary conclusions turning on questions of law" de novo.[12]

"We apply the abuse of discretion standard when reviewing superior courts' rulings on motions for extension of time."[13] We will find an abuse of discretion

---

[9] *See Brandner v. Pease*, 361 P.3d 915, 920 (Alaska 2015) ("In medical malpractice actions . . . the jury ordinarily may find a breach of professional duty only on the basis of expert testimony." (quoting *Trombley v. Starr–Wood Cardiac Grp., PC*, 3 P.3d 916, 919 (Alaska 2000))).

[10] *Titus v. Dep't of Corr.*, 496 P.3d 412, 415 (Alaska 2021).

[11] *Id.*

[12] *Id.*

[13] *Sykes v. Lawless*, 474 P.3d 636, 646 (Alaska 2020) (quoting *Erica G. v. Taylor Taxi, Inc.*, 357 P.3d 783, 786 (Alaska 2015)).

"where we are 'left with the definite and firm conviction on the whole record that the judge . . . made a mistake,' "[14] or "when the decision on review is manifestly unreasonable."[15]

"We apply our independent judgment to questions of law.  We will adopt 'the rule of law which is most persuasive in light of precedent, reason, and policy.' "[16] "Because this court is in virtually the same position as the trial court in its ability to assess the adequacy of . . . pleadings, we review . . . pleadings de novo."[17]

## IV.   DISCUSSION

Doan challenges four of the superior court's decisions on appeal: (1) the exclusion of her proffered experts for lack of the qualifications necessary to testify about the standard of care; (2) the denial of her motion to replace those experts with others; (3) the dismissal of her loss of chance claim; and (4) the finding that the NIED claim was not pled against the doctors.  We address each argument in turn.

### A.    The Orders Excluding Doan's Proposed Experts Misinterpreted The Governing Statutes And Failed To Properly Analyze The Experts' Qualifications.

Like every plaintiff in a medical malpractice claim, Doan was required to prove, among other things, "the standard of care applicable to the defendant . . . under AS 09.55.540(a)."[18]  This requires proof by a preponderance of the evidence of "the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the

---

[14]     *Aldrich v. Aldrich*, 286 P.3d 504, 507 (Alaska 2012) (alterations in original) (quoting *Thomas v. Thomas*, 581 P.2d 678, 679 (Alaska 1978)).

[15]     *Sykes*, 474 P.3d at 646 (quoting *Erica G.*, 357 P.3d at 787).

[16]     *State v. Doe A*, 297 P.3d 885, 887 (Alaska 2013) (quoting *Ford v. Municipality of Anchorage*, 813 P.2d 654, 655 (Alaska 1991)).

[17]     *Gamble v. Northshore P'ship*, 907 P.2d 477, 482 (Alaska 1995).

[18]     *Titus v. Dep't of Corr.*, 496 P.3d 412, 416 (Alaska 2021).

field or specialty in which the defendant is practicing."[19]  Another statute applicable generally to "action[s] based on professional negligence," AS 09.20.185(a), bars anyone from testifying "as an expert witness on the issue of the appropriate standard of care" unless the person is:

> (1) a professional who is licensed in this state or in another state or country;
> (2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and
> (3) certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue.

In *Titus v. Department of Corrections* we reversed a superior court order resting on the same ground as in this case:  that the proposed standard of care expert in a medical malpractice case must be board certified in the same specialty as the defendant in order to satisfy AS 09.20.185(a)(3).[20]  The defendants in *Titus* were emergency room physicians, and the proposed expert was not.[21]  But the expert served "as a consultant to emergency room physicians" and had extensive training in alcohol withdrawal, the relevant medical issue.[22]  We explained that the phrase "matter at issue" as used in AS 09.20.185 "refers to the underlying circumstances of the medical event or treatment giving rise to the medical malpractice action.  Whether an expert's training, expertise, or certification is 'directly related' therefore varies depending on the facts and circumstances of the alleged malpractice."[23]  This means "that physicians with different qualifications than the defendant may, given the specific facts and

---

[19]    AS 09.55.540(a)(2).

[20]    496 P.3d at 417-20.

[21]    *Id.* at 415.

[22]    *Id.*

[23]    *Id.* at 418.

circumstances of the case, nonetheless have knowledge about the standard of care in the defendant's field."[24] In *Titus* we identified a number of factual considerations relevant to a court's determination "whether a proposed expert's expertise, training, and certification are directly related to a matter at issue."[25] We found "[t]his flexible interpretation of 'matter at issue' " to be "consistent with the relevant legislative history of AS 09.20.185."[26]

In its 2016 order precluding the testimony of Holmquist, Dr. Olsen, and Dr. Schiesser, the superior court found that the three proposed experts were "not qualified to testify about the standard of care for emergency room physicians." Though the court did not explicitly state in the order that an expert must be board certified in the same specialty as the defendant, the court alluded to the idea a number of times, and we assume that to have been the basis of its order. The court was more explicit when denying Doan's 2019 motion to allow Dr. Krantz to testify about the standard of care: "[P]laintiff must offer expert testimony in the same special[t]y as board certified physician defendants and not other medical specialties." And denying Doan's motion to substitute experts in 2020, the court reiterated, "Having board certified experts in the same specialty as the defendants has been a central issue in this case for several years and the court's rulings have been consistent on that question."

These orders, like the one at issue in *Titus*, rested on a misinterpretation of AS 09.20.185 and AS 09.55.540. The focus of the superior court's inquiry should

---

[24] *Id.*

[25] *Id.* These "[c]onsiderations include: underlying medical conditions; the medical care or treatment provided (or not provided); the clinical setting; whether the medical condition or treatment is general knowledge to all or most physicians or a specialized procedure limited to a smaller set of physicians; the extent to which the medical care provided involved assessment and treatment of multiple issues simultaneously; and whether there otherwise is a foundation for the expert's opinion about the standard of care for providers in the defendant's field." *Id.*

[26] *Id.*

have been on whether Doan's proposed experts were qualified by licensing, training, experience, and board certification to testify about the "underlying circumstances of the medical event or treatment giving rise to the medical malpractice action";[27] the board certification could be the same as that held by the defendant or it could be different, as long as the certification acknowledged an "expertise and training directly related to the particular field or matter at issue."[28]

We reverse the superior court's orders excluding the testimony of Dr. Olsen, Dr. Schiesser, and Dr. Krantz. Because the superior court's grant of summary judgment rested on Doan's lack of expert witnesses resulting from the orders we now reverse, we vacate the summary judgment against Doan. The superior court on remand should reconsider its exclusion of Dr. Olsen, Dr. Schiesser, and Dr. Krantz as Doan's experts in light of our explanation of the applicable statutory standards in *Titus*. The focus of the superior court's inquiry should be whether these doctors have "training, expertise, [and] certification [that is] 'directly related' " to the "matter at issue."[29]

**B.    The Denial Of Doan's Motion To Substitute A New Expert For Dr. Bronston Was Not An Abuse Of Discretion.**

In February 2020 Doan moved to replace several of her proposed experts — Dr. Bronston, Dr. Olsen, and Dr. Krantz — with others she believed would satisfy the expert qualification requirements as the superior court had interpreted them. The court denied the motion, finding that Doan had not shown good cause to extend the September 2015 deadline for expert disclosures, as she had been aware of her experts'

---

[27]    *Id.*

[28]    *Id.* at 417 (quoting AS 09.20.185(a)(3)).

[29]    *Id.* at 418 (quoting AS 09.20.185(a)(3)). The inquiry necessarily addresses separately the claims against Dr. Cagle and the claims against Dr. Lee. The court need not reconsider the exclusion of Dr. Bronston, which was not appealed. The court also need not reconsider the exclusion of Holmquist because his board certification lapsed in 2006. Holmquist was therefore not qualified as an expert under AS 09.20.185 because he was not "certified by a board recognized by the state."

lack of the required qualifications for years before filing her motion.[30] Doan argues this was an abuse of discretion; she contends that her failure to identify replacements earlier was the result of the superior court's consistent misinterpretation of the expert witness statutes and her efforts to challenge these erroneous rulings.

We do not need to reach the question whether substitutes for Dr. Olsen and Dr. Krantz should have been allowed, as the superior court on remand will be reconsidering the exclusion of their testimony. As for the denial of the motion to substitute another expert for Dr. Bronston, we see no abuse of discretion.

Regardless of the superior court's misinterpretation of the governing statutes, Dr. Bronston became unqualified under AS 09.20.185(a) once his only board certification expired in December 2015, over four years before Doan moved to replace him. The record is not clear as to when Doan received actual notice of this problem; however, the superior court observed that the defense brought Dr. Bronston's lack of certification to Doan's attention in July 2019, when Doan learned that the doctor was retiring and raised the issue of replacing him. Given that another seven months went by before Doan filed her motion, the court did not abuse its discretion by concluding that the motion was untimely and there was no good cause for the delay.

## C.    Alaska Law Does Not Recognize A Claim For Loss Of Chance.

Broadly defined, the loss of chance doctrine authorizes "a claim against a doctor who has engaged in medical malpractice that, although it does not result in a particular injury, decreases or eliminates the chance of surviving or recovering from the preexisting condition for which the doctor was consulted."[31] The classic loss of chance hypothetical involves a physician's treatment of a patient who already has a less than 50 percent chance of survival. The physician is negligent and the patient dies. At trial,

---

[30]    Alaska R. Civ. P. 16(b) provides that the pretrial scheduling order "shall not be modified except upon a showing of good cause and by leave of court."

[31]    *Loss Of Chance Doctrine*, BLACK'S LAW DICTIONARY (11th ed. 2019).

the patient's representative can show both that the physician was negligent and that the physician's negligence reduced the patient's chance of survival. But the plaintiff cannot prove that the patient would have survived "but for" the physician's negligence, as the chance of survival was no better than 50/50 at the start of their encounter.[32] The loss of chance doctrine compensates for this anomaly by permitting a plaintiff to recover some damages even though unable to prove that the defendant's negligence was more likely than not the cause of the patient's death.

States are split on whether to recognize the loss of chance doctrine, and the states that have adopted it are split on the appropriate approach.[33] Courts that favor the doctrine generally follow either (1) the separate injury approach, which recognizes the lost chance of survival as a separate and separately compensable injury,[34] or (2) the

---

[32] *Est. of Frey v. Mastroianni*, 463 P.3d 1197, 1208 (Hawaii 2020) (observing that under traditional " 'all or nothing' rule of tort recovery," medical provider can negligently treat patient with less than 50 percent chance of survival and have no malpractice exposure, because "it is logically impossible for [a plaintiff] to show that the physician's negligence was the but-for cause of her death" (quoting *Matsuyama v. Birnbaum*, 890 N.E.2d 819, 829 (Mass. 2008))).

[33] *Id.* at 1209-11. The Journal of Legal Economics listed 41 states as having decided whether to recognize loss of chance claims as of April 2015, with 24 adopting the doctrine and 17 rejecting it. Lauren Guest et al., *The "Loss of Chance" Rule as a Special Category of Damages in Medical Malpractice: A State-by-State Analysis*, J. LEGAL ECON., Apr. 2015 at 59.

[34] *See Est. of Frey*, 463 P.3d at 1210 ("States adopting [the separate injury approach] have essentially created a new tort which recognizes the loss of chance as a compensable injury distinct from other medical malpractice claims."); *Matsuyama*, 890 N.E.2d at 832 ("[T]he plaintiff must prove by a preponderance of the evidence that the physician's negligence caused the plaintiff's injury, where the injury consists of the diminished likelihood of achieving a more favorable medical outcome.").

substantial factor approach, which allows causation to be proven by something less than a probability.[35]

We have not yet determined whether the loss of chance doctrine is compatible with Alaska law.[36] But the Alaska Legislature has addressed most aspects of medical malpractice actions by statute.[37] Alaska Statute 09.55.540(a)(4) addresses both the burden of proof and causation: "In a malpractice action based on the negligence or wil[l]ful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence" that "as a proximate result of [the] lack of knowledge or skill or the failure to exercise [the required] degree of care, the plaintiff suffered injuries that would not otherwise have been incurred." Available damages include "both economic and noneconomic damages,"[38] but noneconomic damages are "limited to compensation for pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life, loss of consortium, and other nonpecuniary damage, but may not include hedonic damages."[39]

The superior court determined that "Alaska law does not permit a claim for negligent treatment that reduced Tristana Doan's opportunity of avoiding death." The court found support in two Alaska federal district court decisions, both of which

---

[35] *See Cohan v. Med. Imaging Consultants, P.C.*, 900 N.W.2d 732, 740 (Neb. 2017) (explaining that the substantial factor approach, also referred to as the "relaxed causation approach," "simply loosens the traditional standard of evidentiary sufficiency, permitting the causation issue to be resolved by the fact finder even though there is no evidence of a reasonable probability that the defendant's negligence caused the patient's death or other ultimate harm").

[36] The issue was before us in *Parson v. Marathon Oil Co.*, 960 P.2d 615, 620 (Alaska 1998), but we decided the case on other grounds and did not reach it.

[37] AS 09.55.530-.560.

[38] AS 09.55.549(b).

[39] AS 09.55.549(c). " '[H]edonic damages' means damages that attempt to compensate for the pleasure of being alive." AS 09.55.549(h)(3).

concluded that we were unlikely to recognize a loss of chance claim. In *Crosby v. United States*, the court found that the loss of chance theory "would contravene the clear and unambiguous language of AS 09.55.540."[40] A second federal judge followed suit in *Helms v. United States*, explaining, "[T]his Court is unaware of any Alaska authority that would allow the Court to alter the statutorily-mandated burden of proof or the causation requirement set forth in AS 09.55.540."[41]

We agree with the superior court's decision in this case. First, allowing recovery for a loss of chance under the "substantial factor" approach is inconsistent with the express language of Alaska's statutes intended to govern the basic aspects of medical malpractice actions and recovery. Under AS 09.55.540, a plaintiff must prove by a preponderance of the evidence that "as a *proximate result* of [the] lack of knowledge or skill or the failure to exercise [the required] degree of care, the plaintiff suffered injuries *that would not otherwise have been incurred*."[42] This statutory formula encompasses both prongs of legal causation as we have explained it in the past: both proximate or "legal policy" cause (which focuses on "whether the conduct has been so significant and important a cause that the defendant should be legally responsible") and actual or "but for" cause (meaning that "the event would not have occurred but for [the defendant's] conduct").[43] Doan argues that a lost chance of survival can be fairly considered an "injury" under AS 09.55.549. But assuming that the word "injury" encompasses the loss of a less than 50 percent chance of survival, the

---

[40]    *Crosby v. United States*, 48 F. Supp. 2d 924, 931 (D. Alaska 1999).

[41]    *Helms v. United States*, No. 3:11-CV-00186-SLG, 2014 WL 2561995 at *5 (D. Alaska June 6, 2014).

[42]    AS 09.55.540(a)(4) (emphasis added).

[43]    *Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 (Alaska 1993) (quoting W. PAGE KEETON AND WILLIAM LLOYD PROSSER, PROSSER AND KEETON ON TORTS §§ 41, 42 (5th ed. 1984)).

explicit language of AS 09.55.540 still requires us to reject a claim that would rest on a relaxation of but-for causation.

We are also not persuaded that recognizing lost chance as a separate injury is consistent with the relevant statues and legislative intent. In drafting AS 09.55.540, "the legislature was primarily concerned with avoiding increases in malpractice insurance rates."[44] In more recent amendments the legislature narrowed recovery rather than expanding it, not only imposing damages caps but also prohibiting recovery of "hedonic damages," damages intended "to compensate for the pleasure of being alive."[45] The policy choices the legislature has brought to bear when defining the burden of proof, causation, and recoverable damages in medical malpractice actions are

---

[44] *Priest v. Lindig*, 583 P.2d 173, 175 (Alaska 1978). A committee report explained: "This bill attempts to codify the law with respect to the burden of proof in medical and dental malpractice actions and counter the 1964 case of *Patrick v. Sedwick*, Alaska, 391 P.2d 453, the effect of which is said to be an intolerable rule of law resulting in astronomically high malpractice insurance rates. Basically the bill requires that, in these actions, negligence be proved and not presumed." *Id.* at 175 n.7.

[45] *See* Statement of Brian Hove, Staff, Senator Seekins at 9:18-21, 24, Hearing on S.B. 67 Before the Senate Judiciary Standing Comm., 24th Leg., 1st Sess. (Mar. 8, 2005) (explaining that bill that would become AS 09.55.549 sought to alleviate the "crisis in Alaska's healthcare industry" by limiting recoverable noneconomic damages in medical malpractice actions to $250,000). We recognize the lack of elucidating legislative history regarding the decision to prohibit recovery of hedonic damages, "damages that attempt to compensate for the pleasure of being alive," while at the same time, in the same sentence, allowing recovery of damages for "loss of enjoyment of life." AS 09.55.549(c), (h)(3). The two damage categories are generally viewed as synonymous. *See, e.g.*, *Montalvo v. Lapez*, 884 P.2d 345, 347 n.2 (Hawaii 1994) ("Hedonic damages are damages 'for the loss of enjoyment of life, or for the value of life itself.' " (quoting BLACK'S LAW DICTIONARY (6th ed. 1990))); *Stachulski v. Apple New England, LLC*, 191 A.3d 1231, 1242 (N.H. 2018) (recognizing availability of "hedonic damages, or loss of enjoyment of life damages," in cases involving permanent injury); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 763 (Tex. 2003) (" 'Hedonic' damages are another type of non-economic damages and compensate for loss of enjoyment of life.").

just as relevant when deciding whether the loss of chance doctrine should apply.[46]  We leave "the choice between competing notions of public policy . . . to be made by elected representatives of the people."[47]  The superior court did not err when it dismissed Doan's loss of chance claims.

**D.    It Was Error To Determine That Doan's Second Amended Complaint Pled An NIED Claim Against Only The Hospital.**

Finally, Doan contends that the superior court erred when it decided that her NIED claim, entitled "Negligent Infliction of Emotional Distress by the Defendants," was asserted only against the hospital.[48]  The count's two descriptive sentences mention only that it was "[t]he negligent acts of [the hospital]" that "subjected [Doan] to extreme emotional distress and were the proximate causes of emotional damages to [Doan]."  The doctors argue that the claim therefore failed to give them the required notice that the claim was levied against them.

"Alaska has a fairly lenient 'notice pleading' standard."[49]  Civil Rule 8(a) requires that any "pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and

---

[46]    The federal court in *Crosby v. United States* listed "the primary arguments" for and against recognition of a loss of chance claim, and they are largely policy arguments.  48 F. Supp. 2d 924, 928-29 (D. Alaska 1999) (citing Daniel J. Anderson, *"Loss of Chance" in Utah?*, 9 UTAH B.J. 8, 11 n. 6 (1996)).  The court listed eight arguments in favor of the claim (such as without it, "[h]ealth care providers may be less inclined to perform a full spectrum of diagnostic tests in hopeless or less than optimistic cases") and fourteen arguments against it (such as "[m]ore cases would be filed" and "it is impractical to require the medical profession to act" as if medicine is "an exact science").  *Id.*

[47]    *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974).

[48]    This conclusion was the basis on which the court denied Doan's motion to amend her complaint for the third time; the court found that she was attempting to raise new claims, particularly the NIED claim against the doctors.

[49]    *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 181 (Alaska 2009).

(2) a demand for judgment for the relief the pleader seeks"; however, "[n]o technical forms of pleading or motions are required."[50] "[T]he rule is satisfied by a brief statement that give[s] the defendant fair notice of the claim and the grounds upon which it rests."[51]

The notice pleading standard was met in this case. Doan labeled her claim as being brought against "the Defendants," a term that encompassed the doctors. Although the further two-sentence description of the claim mentioned only "[t]he negligent acts of [the hospital]," it also "reallege[d] and incorporate[d] by reference" preceding paragraphs, which included multiple claims of medical malpractice against both Dr. Cagle and Dr. Lee. Most importantly, as Doan points out, "[n]otice pleading obviously worked in this instance." The doctors defended against the claim from the very start. Dr. Cagle first moved to dismiss the NIED claim on substantive grounds, a motion joined by Dr. Lee. And when the NIED claim was before this court on a petition for review, Dr. Cagle and Dr. Lee filed a brief as respondents.[52] Because the doctors clearly had notice that Doan meant to include them as defendants in the NIED claim, it was error to hold that the claim was directed solely against the hospital.

## V. CONCLUSION

The final judgments in favor of the defendants are VACATED. The orders excluding the testimony of Dr. Olsen, Dr. Schiesser, and Dr. Krantz are REVERSED. The denial of the motion to substitute another expert witness for Dr. Bronston and the grant of summary judgment on Doan's loss of chance claims are AFFIRMED. The holding that Doan's NIED claim was pled only against the hospital

---

[50] Alaska R. Civ. P. 8(e)(1).

[51] *Bigley*, 208 P.3d at 181 (quoting *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 673 (Alaska 2002) (Bryner, J., dissenting) (internal quotation marks omitted)).

[52] Brief of Appellees and Cross-Appellants, *Doan v. Banner Health, Inc.* (*Doan I*), 442 P.3d 706 (Alaska 2019).

is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.